**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **PAULSON PRV HOLDINGS LLC; DUO CONDADO JV HOLDINGS LLC; BAHIA BEACH HOLDING COMPANY LLC; AIP PR HOLDINGS LLC; SJ BEACH PR LLC; AND REGENCY ACQUISITION LLC.** | **CIVIL NO. 23 –1521** |
| **Plaintiffs,** | **PLAINTIFFS DEMAND TRIAL BY JURY** |
| **v.** | |
| **FAHAD GHAFFAR; GLENDA ACEVEDO-MARTINEZ; GLEN ACEVEDO; AMIR GHAFFAR; SAIRA GHAFFAR; FARAH VAYANI; NERISSA APONTE; THINKING AHEAD LLC; GGSG LLC; COVERISQ LLC; TYGATE PTE LTD.; AND SYBER GROUP LLC.** | **CIVIL RICO; FRAUD; BREACH OF FIDUCIARY DUTIES; UNJUST ENRICHMENT AND DAMAGES** |
| **Defendants.** | |

<u>**THE PAULSON ENTITIES' RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT COMPLAINT AGAINST FAHAD GHAFFAR AND HIS ACCOMPLICES AND CO-CONSPIRATORS**</u>

## I.     <u>INTRODUCTION</u>

This action, which seeks over $189,600,000 in damages on behalf of Plaintiffs Paulson PRV Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, AIP PR Holdings LLC, SJ Beach PR LLC, and Regency Acquisition LLC (collectively, where appropriate, "Plaintiffs" or "Paulson Entities"), is the culmination of years of criminality, deceitful machinations and underhanded self-dealing by Defendant Fahad Ghaffar ("Fahad"), to unjustly enrich himself and his family in blatant disregard of the legal duties he owed to John Paulson ("Paulson") and his business ventures in Puerto Rico. Though Fahad touted himself a loyal

member of the Paulson team and a philanthropist, nothing could be further from the truth. For years he and his co-conspirators siphoned off value from the Paulson Entities at every turn, betraying Paulson's trust and biting the hand that had fed them. Fahad's greed corrupted the business decisions he was supposed to make for Paulson's benefit, betraying the confidence Paulson had placed in him with shocking ease. He also leveraged his authority to conceal his plots from Paulson and to ensure his own subordinates never challenged his decisions. Fahad and his co-conspirators operated under Paulson's radar for years until being discovered when Fahad went on a two-month vacation to the Mediterranean Sea on his recently purchased yacht. The full extent of Fahad's misconduct is still unfolding, but, to date, an internal investigation paints a stark picture of how he conducted his affairs. Fahad's racketeering activity includes, but is not limited to, embezzling corporate assets to finance an extravagant lifestyle for himself and his wife, diverting business to himself and his family members for their enrichment and to the detriment of Paulson, fraudulently inflating the cost of goods and services provided by family members to increase commissions relating to that business, systematically diverting money and other benefits to his co-conspirators and shell entities for no consideration or based on false pretenses, insurance fraud, tax fraud, setting up a sham charitable foundation, extortion and planting false evidence. This conduct was performed as part of several criminal enterprises and constitutes a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.

## II.   NATURE OF THE ACTION

1.      This is an action under Section 1964(c) of RICO for treble damages, arising from the injuries suffered by Plaintiffs to their business and property due to Defendants' pattern of

racketeering activity in violation of Sections 1962(a), (c) and (d) of RICO, all performed as part of an ongoing criminal enterprise.

2.      This action also arises under Article 2.03 of the Puerto Rico General Corporations Act, 14 P.R. Laws Ann. §3523, and Article 1536 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 10801,[1] for compensatory damages suffered by the plaintiffs as a result of Defendants' willful and malicious tortious conduct.

### III.      JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action because this case sets forth violations of a federal statute, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.

4.      The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over all remaining parties and claims in this case, as the claims against those parties are so related to claims in the action over which the Court has original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred within this judicial district.

### IV.      THE PARTIES

6.      Plaintiff Paulson PRV Holdings LLC, ("Paulson PRV") is an LLC organized and existing under the laws of Delaware, but duly authorized to do business in Puerto Rico, with its principal place of business at 251 Little Falls Drive, Wilmington, New Castle, Delaware. Paulson

---

[1] This Article was formerly known as Article 1802.

PRV is engaged in the hotel industry and in real estate development and investments. Paulson PRV is a citizen of Delaware and New York, where its members are domiciled.

7.     Plaintiff Duo Condado JV Holdings LLC ("Duo Condado JV Holdings") is a Puerto Rico-based LLC with its principal place of business at Popular Center, Floor 19, 208 Ponce de Leon Avenue, San Juan, PR 00918. Duo Condado JV Holdings is engaged in the hotel industry and in real estate development and investments. Duo Condado JV Holdings is a citizen of Delaware and New York because its sole member is Paulson PRV.

8.     Plaintiff Bahia Beach Holding Company LLC ("Bahia Beach Holding Company") is a corporation organized and existing under the laws of Delaware, but duly authorized to do business in Puerto Rico, with its principal place of business at 251 Little Falls Drive, Wilmington, New Castle, Delaware. Bahia Beach Holding Company is engaged in the hotel industry and in real estate development and investments. Bahia Beach Holding Company is a citizen of Delaware and New York because its sole member is Paulson PRV.

9.     Plaintiff AIP PR Holdings LLC ("AIP PR") is a Puerto Rico-based LLC with its principal place of business at Popular Center, Floor 19, 208 Ponce de Leon Avenue, San Juan, PR 00918. AIP PR is engaged in the commercial real estate industry. AIP PR is a citizen of Delaware and New York because its sole member is Paulson PRV.

10.     Plaintiff SJ Beach PR LLC ("SJ Beach PR") is a Puerto Rico-based LLC with its principal place of business at American International Plaza, 250 Munoz Rivera Avenue, Floor 6, San Juan, PR 00918.  SJ Beach PR is engaged in the hotel industry and in real estate development and investments. SJ Beach PR is a citizen of Delaware and New York because its sole member is Paulson PRV.

11.     Plaintiff Regency Acquisition LLC ("Regency Acquisition") is a Puerto Rico-based LLC with its principal place of business at Popular Center, Floor 19, 208 Ponce de Leon Avenue, San Juan, PR 00918. Regency Acquisition is engaged in the hotel industry and in real estate development and investments. Regency Acquisition is a citizen of Delaware and New York because its sole member is Paulson PRV.

12.     Defendant Fahad Ghaffar is an individual who was born in Pakistan, moved to the United States, settled in Florida, moved to New York, and is now a resident of San Juan, Puerto Rico. He possesses a tax grant pursuant to Puerto Rico Act No. 22-2012, 13 P.R. Laws Ann. §10851 *et seq*. Fahad worked closely with Paulson since 2013. Through a maze of shell companies and sham entities, including, but not limited to, Better Puerto Rico LLC, Better Puerto Rico Management LLC, Ocean Front Consulting LLC, Ace LLC, Thinking Ahead LLC, RE Consulting LLC, ICON Services LLC, FG Hospitality LLC, Grateful LLC, Aria Growth Partners, and CCBF LLC, Fahad was able to disguise and conceal the nature and extent of his criminal activity from the Paulson Entities and Paulson himself. Paulson terminated Fahad for cause and removed him from all operating responsibilities at all Paulson-controlled entities on July 31, 2023.

13.     Defendant Thinking Ahead LLC, ("Thinking Ahead") upon information and belief, is an LLC incorporated in Puerto Rico in 2021 with its principal place of business at 221 Ponce de Leon Avenue, 5th Floor, San Juan, Puerto Rico 00917. Fahad incorporated Thinking Ahead to be able to misrepresent his personal expenses on private jet charters and entertainment, such as lavish dinners and nightclub bottle service, for which he billed the Paulson Entities, as purported legitimate costs incurred by Thinking Ahead for which he was entitled to reimbursement. Upon information and belief, Thinking Ahead is a citizen of Puerto Rico because its members are citizens of Puerto Rico.

14.    Defendant Glendaliz Acevedo-Martinez ("Glenda") is an individual and citizen of San Juan, Puerto Rico. She is the wife of co-Defendant Fahad Ghaffar and the two have a prenuptial agreement. Glenda is a dietician whose *professional* experience included managing her Instagram page and hosting live sessions on her Facebook account where she provided nutritional advice to her viewers. Glenda is not and has never been an interior designer or decorator, nor does she possess a license in this field.

15.    Defendant GGSG LLC is, upon information and belief, a single-member LLC incorporated in Puerto Rico by Defendant Glendaliz Acevedo-Martinez with the sole purpose of serving as a shell intermediary in the purchase of furniture for Paulson's Puerto Rico hotels. At all times relevant to this complaint, Glenda brazenly registered her shell company to the very same address where the Paulson Entities and Fahad's offices were previously located, 250 Munoz Rivera Ave., Suite 1400, San Juan, PR 00918. After Paulson discovered her scheme, she changed the company's registered address to 221 Ponce de Leon Avenue, 5th Floor, San Juan, PR 00917. Upon information and belief, GGSG LLC is a citizen of Puerto Rico because its members are citizens of Puerto Rico.

16.    Defendant Glen Acevedo ("Glen") is an individual and, upon information and belief, citizen of Cayey, Puerto Rico. He is Glenda's father and Fahad's father-in-law. As part of his unrelenting efforts to finance his and his family's extravagant lifestyle with corporate funds, Fahad caused the Paulson Entities, through one of the Paulson Hotels, to provide and pay for an Audi Q3 that belonged to a Paulson Eentity for Glen, even though Glen was not, and had never been, an employee of any of the Paulson Entities. Fahad further caused Paulson to pay for the insurance for Glen's vehicle, which was ultimately damaged in a car wreck while driven by Glen.

17.     Defendant Amir Ghaffar ("Amir") is an individual and citizen of Australia.  Amir is Fahad's brother. At all times relevant to this Complaint, Amir was a close ally of Fahad and conspired with him to exploit business opportunities for their personal enrichment, at the expense of the Paulson Entities.

18.     Defendant Coverisq LLC ("Coverisq"), upon information and belief, is an LLC incorporated in Puerto Rico and, at all times relevant to the Complaint, had its principal place of business at 250 Muñoz Rivera Avenue, Suite 308, San Juan, PR 00918. Amir incorporated Coverisq for the purpose of engaging in the sale and marketing of insurance policies and related financial products. At all times relevant to this Complaint, Amir was the president of Coverisq, and he used the company to enrich himself when Fahad improperly funneled the Paulson Entities' insurance business to Coversiq, a business arrangement that Fahad and Amir secured by extorting the Paulson Entities' prior insurance brokers and by abusing Fahad's authority at the Paulson Entities.

19.     Defendant Tygate Pte. Ltd. ("Tygate"), upon information and belief, is a company incorporated in Singapore, and controlled by Amir, a citizen of Australia. Tygate has been known by various other names including: SGIB Pte. Ltd. ("SGIB"), Electromatic Pte. Ltd., Sylase Technologies Pte. Ltd., V-Mark Laser Pte. Ltd., and Sinar Photonics Pte. Ltd. At all times relevant to the Complaint, Amir used Tygate to enrich himself when Fahad improperly funneled the Paulson Entities' insurance business to Tygate, a business arrangement that Fahad and Amir secured by extorting the Paulson Entities' prior insurance brokers and by abusing Fahad's authority at the Paulson Entities. The commission monies received by Tygate and SGIB were disguised as "consulting fees" by Fahad and/or Amir, as Tygate and/or SGIB were not licensed

to receive insurance-related commissions, nor did the companies provide meaningful services to the entities extorted by Fahad and/or Amir.

20.     Defendant Nerissa Aponte ("Nerissa") is an individual and citizen of San Juan, Puerto Rico. She is a former employee of the Paulson Entities and was assigned to serve as Fahad's personal assistant. At all times relevant to the Complaint, Nerissa assisted Fahad in the commission of the illegal acts detailed below and, upon information and belief, also received benefits and/or consideration for her involvement in the schemes detailed below.

21.     Defendant Saira Ghaffar ("Saira") is an individual who, upon information and belief, is a citizen of Dubai, United Arab Emirates. She is Fahad's sister. At all times material to this Complaint, Saira was a vendor of the St. Regis and, as part of a scheme orchestrated in conjunction with Fahad, she sold rugs, art, and LED lights to the resort at significantly inflated prices to pocket the inflated margin at Paulson's expense.

22.     Defendant Farah Vayani ("Farah") is an individual who, upon information and belief, is a citizen of Karachi, Pakistan. She is also Fahad's sister. In 2022, Vayani incorporated Syber Group LLC ("Syber") and conspired and colluded with Fahad to sell information technology devices to the Paulson entities at inflated prices in order to pocket the inflated margin at Paulson's expense.

23.     Defendant Syber Group LLC is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico with its principal place of business at 300 Avenida La Sierra Del Rio, Q-10, Apartment 176, Calle 6, San Juan, PR 00926. In 2023, Syber sold information technology devices to the Paulson entities at inflated prices. Upon information and belief, Syber Group LLC is a citizen of Pakistan because its members are citizens of Pakistan.

## V.   FACTUAL BACKGROUND

***Fahad's origins at Paulson's companies: from unemployment to becoming Paulson's deputy.***

24.     In 2013, Fahad was an unemployed small-time commercial real estate investor in Tampa, Florida who was floundering to make deals.

25.     Paulson was the self-made highly successful owner of Paulson & Co. Inc., an investment firm based in New York City that managed billions of dollars in client assets.

26.     In 2013, Fahad sought out Paulson and begged for an opportunity to work for him. He was attracted by the opportunity of working for a hugely successful businessman. Paulson was persuaded to offer Fahad a position as a junior analyst at Paulson & Co. Inc.

27.     Fahad accepted the position and began working for Paulson directly.

28.     Shortly thereafter, Paulson expanded his investments in Puerto Rico and Fahad was tasked with assisting the senior managers of these investments.

29.     Eventually, when he was issued a tax grant pursuant to Puerto Rico Act No. 22-2012, 13 P.R. Laws Ann. §10851 *et seq*., Fahad moved to Puerto Rico.

30.     Sometime thereafter, Fahad began traveling to Puerto Rico as part of his work for Paulson and met Glenda. Glenda was obsessed with amassing wealth by any means necessary. In Fahad, she saw an opportunity to achieve the life of luxury she always longed for.

***A wedding cake topped with a bribe.***

31.     On January 4, 2020, Fahad and Glenda married at the St. Regis Bahia Beach Resort in an extravagant ceremony, in the presence of hundreds of guests. Consistent with Fahad's use of his position with Paulson to become a major political and business player in Puerto Rico, as Glenda was busy planning her luxurious dream wedding, Fahad was tending to his guest list of politicians and prominent businesspeople, ensuring that guests were seated in a manner that furthered his

personal interests. In fact, on his wedding day, Fahad was occupied with coordinating a meeting between banker Julio Herrera-Velutini and the former governor of Puerto Rico, Wanda Vázquez-Garced. This meeting was allegedly part of a scheme that resulted in the termination of the Commissioner for Financial Institutions of Puerto Rico and the indictment of both Herrera-Velutini and Vazquez-Garced for bribery, among other federal crimes. Fahad's involvement in the scheme is extensively referenced in the indictment.

32.    As further detailed in this Complaint, Glenda's marriage to Fahad has proven to be an economically beneficial endeavor for Glenda.

### *The Management Services Agreement and Fahad's legal duty of loyalty to Paulson.*

33.    As the years passed, Fahad continued to earn Paulson's trust and he began to ascend to the point where he was effectively serving as the senior manager of Paulson's investments in Puerto Rico.

34.    Paulson placed a great deal of trust in Fahad and, at all times relevant to this action, Fahad had a legal obligation to put the interest of Paulson's companies above his own.

35.    On the few yearly occasions that Paulson would visit the island, Fahad would be glued to his side, reluctant to allow any other Paulson senior manager or employee to have access to Paulson outside of his presence in order to control the information shared with Paulson.

36.    Eventually, Paulson designated Fahad to oversee all of Paulson's Puerto Rico-based investments— the Condado Vanderbilt Hotel ("Vanderbilt"), La Concha Renaissance San Juan Resort ("La Concha"), and the St. Regis Bahia Beach Resort ("St. Regis") (collectively, where appropriate, "Paulson Hotels"); Ocean Drive Development, LLC; Condado Duo La Concha Hotel Tower SPV, LLC; Earle HC, LLC; and Bahia Beach CH, Development, LLC (collectively, "the Paulson Entities").

37.     Fahad consistently misrepresented his ownership stakes in the Paulson Entities. For instance, although he continuously represented himself as an "owner" or "shareholder" of the Paulson Entities, he owns 0% of Paulson PRV, 0% of the St. Regis Hotel, 0% of Bahia Beach Resort, 0% of F40, 0% of the AIP office building, 0% of the 270 Munoz office building, 0% of the Condado Ocean Club, 0% of PRV Funding LLC, 0% of Retail Office Ashford LLC, 0% of 1051 Ashford LLC, 0% of Ocean Park Puerto Rico LLC, 0% of numerous real estate parcels owned, only 1% of Harbour Lakes at Palmas del Mar, and approximately 3.5% of Condado Duo.

38.     In or around 2019, Fahad obtained a tax exemption decree for FG Hospitality LLC and began conducting transactions through that entity and other corporate entities owned and/or controlled by him.

39.     On October 1, 2020, the Paulson Entities and FG Hospitality LLC, through its sole member, Fahad Ghaffar, executed a Management Services Agreement ("MSA"). Pursuant to the MSA, Fahad was tasked with managing various aspects of the Paulson Entities and was given authority to supervise and operate the Paulson Entities, including the authority to direct the actions of all the other officers of the Paulson Entities in Puerto Rico. The MSA did not provide for Fahad, nor any of his entities, to have a stake in any of the Paulson Entities.

40.     However, it was Paulson, not Fahad, who had final authority over all matters relating to the Paulson Entities, including approval of any actions undertaken by any office, director, or authorized representative – such as Fahad – which were not consistent with previously approved budgets and policies or ordinary course of business practices of the Paulson Entities.

41.     At all times relevant to this Complaint, Fahad had a duty to act in the best interest of the shareholders of the Paulson Entities.

42.     Per the MSA and the duties imposed on directors, officers, and managers by the Puerto Rico Civil Code, major capital expenses had to be consulted with Paulson.

***A shady business deal turned into Fahad and Glenda's family home.***

43.     Upon information and belief, in or about August 2016, CCBF LLC ("CCBF") was a limited liability corporation owned and controlled by the same beneficial owners as Construction Company 1.

44.     On August 31, 2016, CCBF, through its authorized representative, a partner and/or comptroller at Construction Company 1, acquired the lot where Fahad's current residence is located, 1125 Seaview Street in San Juan, Puerto Rico, for $1,250,000. At that time, CCBF was registered at the same address as Construction Company 1's offices are located: 1010 Calle Harvard, Esq. Interamericana, University Gardens, San Juan, PR 00926.

45.     On December 31, 2016, after extensive negotiations where Fahad had a prominent role, Paulson PRV acquired a failed residential complex in the Palmas del Mar community in Humacao, Puerto Rico—Harbour Lakes—for $19,200,000 from Construction Company 1.

46.     Subsequently, upon information and belief, on or around December 13, 2018, Fahad assumed ownership and control over CCBF LLC. On that same date, CCBF changed its registered address to Paulson PRV's address and Construction Company 1's partner and/or comptroller was removed as the resident agent for CCBF. Both changes were signed by a written consent on that date by the new sole member of CCBF: Fahad Ghaffar.

47.     At that moment, upon Fahad assuming control of CCBF, he also became the ultimate owner of the property at 1125 Seaview Street.

48.     Upon information and belief, Fahad received the lot at 1125 Seaview Street as a transfer from Construction Company 1 to reward him for his assistance in the sale of Harbour Lakes and the subsequent grant of contracts in developing projects. In essence, Fahad caused Paulson to overpay for Harbour Lakes and/or for the services purportedly rendered in the Bahia development project as consideration for receiving the lot.

*The scheme to enrich Glenda through GGSG, the shell company, at Paulson's expense.*

49.     On March 12, 2021, Glenda formed and registered Defendant GGSG, a shell company created for the sole purpose of skimming commissions for herself from the sale of the outdoor furniture to the Paulson Hotels.

50.     On April 5, 2021, Fahad, the Paulson Entities' highest-ranking official in Puerto Rico, who reported directly to Paulson, sent an e-mail to several high-ranking managerial employees at the Paulson Entities, with a copy to Glenda. Fahad excluded John Paulson from that e-mail in a deliberate attempt to conceal the furniture purchases from Glenda's shell company.

51.     In the e-mail, Fahad informed management that the Paulson Entities would – from that moment on – be acquiring its furniture for the Paulson Hotels directly from a company that Glenda was going to establish (Defendant GGSG).

52.     The shell company did not have a warehouse, a showroom, workforce, a distribution network, or any prior relationships with any furniture maker or furniture vendor. Incredibly, the company's registered address was American International Plaza, 250 Munoz Rivera Ave., Suite 1400, San Juan, PR 00918, the headquarters of the Paulson Entities and Fahad's former office.  Important to the scheme was the fact that Glenda, as an intermediary, marked-up purchases from a European Furnituremaker by approximately 55% and pocketed approximately

$1,000,000.00 in improper commissions, thus taking advantage of the Paulson Hotel clients that Fahad provided and placed in her lap.

53.     Glenda was a registered dietitian. She was not a licensed decorator and had no prior experience in furniture sales, or in interior or exterior decoration. A cursory review of her Instagram page, @askmewhattoeat, shows her traveling the world, likely at Paulson's expense, and advising her followers on how to prepare healthy dishes. She does not market herself as a designer, nor does she advertise her shell company as a purchasing agent for furniture or any other business.

54.     In his e-mail to management, Fahad tipped his hand about what motivated his decision to engage Glenda when he quipped that the business arrangement with the shell company "would be helpful to [him] in [his] marriage…". The email also contained a material misrepresentation by Fahad that the arrangement with the shell company would *save* the Paulson Entities and the Paulson Hotels money.

55.     It is noteworthy that, in his e-mail, Fahad attached two orders that he had already approved prior to alerting local management of this decision.

56.     Between April 2021 to July 2023, as orchestrated by Fahad, the Paulson Entities purchased virtually all the exterior furniture for the Paulson Hotels and their related residential developments from Glenda's shell company.

57.     Fahad caused Paulson to pay in excess of $3,200,000.00 to GGSG, Glenda's shell company, for the purchase of furniture.

58.     Glenda, through the shell company, personally made approximately $1,000,000.00 in commissions from these sales for setting up a shell company, marking up the furniture by 55%, invoicing from the furnituremaker through the shell company, and selling it to the Paulson Hotels.

59.     Upon information and belief, however, Fahad misrepresented to the Paulson Entities that Glenda was the person working with the European Furnituremaker to select the furniture and arrange for its purchase and delivery. In fact, it was Fahad himself who dealt directly with salespeople from the European Furnituremaker to the point that the European Furnituremaker's representatives understood they were conducting business *directly* with the Paulson Hotels, and not through an intermediary.

60.     On numerous occasions, verbally and by electronic communications, and as recently as June 14, 2023, Fahad and/or Glenda falsely represented to Paulson and/or high-ranking employees of the Paulson Entities that the engagement of the shell company was indispensable in order to purchase furniture from the European Furnituremaker because it did not sell to directly to hotels. This statement, which was a fundamental premise of the transactions at issue, was materially false and was made with the intention of obtaining commissions from the Paulson Entities to which Glenda was not entitled.

61.     Fahad and/or Glenda also insisted that purchasing the European Furnituremaker's furniture through the shell company was saving the Plaintiffs a significant amount of money because the shell company could acquire the furniture directly from the European Furnituremaker at a significant discount. This material statement was also false, as the hotel could purchase directly from the European Furnituremaker and save commissions paid to Acevedo through her shell company. This statement was a fundamental premise of the transactions at issue. In reality, Fahad authorized the arrangement in order to help his marriage with Glenda and illegally enrich her by obtaining commissions from the Paulson Entities to which Glenda was not entitled.

62.     Fahad and/or Glenda also deliberately concealed from Paulson the fact that Defendant Aponte, Fahad's assistant, and an employee of the Paulson Entities, was providing

services to the shell company, including preparing requests to transfer funds via wire from the shell company's bank account at Oriental Bank & Trust to the European Furnituremaker.

63.     Despite maintaining a close working relationship with Paulson during the period that the Paulson Entities were purchasing furniture from the shell company, Fahad and Glenda intentionally concealed Glenda's role in the furniture purchases from Paulson.

64.     Paulson never approved a single purchase order for any of the Paulson properties that included Glenda's shell company as the vendor.

65.     When Paulson uncovered this scheme and questioned Fahad about the arrangement with Glenda's shell company, Fahad repeated his misrepresentations that the European Furnituremaker did not sell directly to hotels and, as such, Glenda was a necessary intermediary. He also justified his actions in including Glenda in the transaction by continuing to misrepresent the fact that the arrangement had resulted in savings for the Paulson Entities and the Paulson Hotels.

66.     However, Paulson confirmed directly with the vendor that the European Furnituremaker would absolutely sell *directly* to the Paulson Hotels at the *same price* they sold to the shell company and that, at all times during Glenda's engagement with the Paulson Hotels, the furnituremaker was under the impression that they were selling directly to the Paulson Hotels.

67.     Upon information and belief, Fahad and Glenda knowingly and willfully inflated furniture costs in a fraudulent manner to earn higher commissions. Thus, when GGSG invoiced Plaintiffs, those invoices contained material misrepresentations about the actual market-driven cost of the furniture Acevedo was selling to the Paulson Hotels. These material misrepresentations were made as part of a scheme and artifice to defraud the Plaintiffs by collecting illegal commissions.

68.    The scheme and artifice to defraud was carried out by Fahad, Glenda, Nerissa, and GGSG, who acted as an association-in-fact enterprise at all times relevant to this Complaint.

69.    At all times relevant to this Complaint, the communications related to Glenda and GGSG's sales of furniture to the Paulson Hotels, including communications containing fraudulently inflated invoices and material misrepresentations regarding the fact that the European Furnituremaker could not sell directly to the Paulson Hotels, were sent via electronic mail in interstate commerce and funds were transmitted via wire/ach transactions.

70.    Each of the following mailings was sent in furtherance of the scheme and artifice to defraud the Paulson Entities and enrich Glenda and GGSG and collectively constitute a pattern of racketeering activity.

a.    On April 5, 2021, Fahad sent an e-mail to several high-ranking managerial employees at the Paulson Entities, with a copy to Glenda, that included two invoices, which contained fraudulently inflated furniture prices, that Fahad had already approved for payment.

b.    On June 3, 2023, Fahad sent an email to Paulson setting forth the false narrative regarding how Glenda was a necessary intermediary with the European Furnituremaker and repeating the lie that the Paulson Entities were saving money by ordering furniture through the shell company.

c.    On July 14, 2023, Glenda sent Paulson an email explaining the costs associated with her services and repeating the same false narrative that the Paulson Entities were saving money by purchasing furniture through her shell company.

*The scheme to enrich Amir at Paulson's expense.*

71.     Fahad and Paulson were both shareholders and partners in One Mobility LLC, a car insurance agency that they intended to use to complement their car dealership businesses.

72.     Fahad urged Paulson to involve Amir in the business and Paulson reluctantly agreed, but only accepted that Amir be compensated 10% of any dividend the partners declared in the regular course of business.

73.     Later, Paulson found out that Fahad paid Amir $255,000 in advanced commissions without a declaration of dividends or a distribution to One Mobility LLC's shareholders, which was a prerequisite to Amir receiving his 10% commission.

*The scheme to steal reconstruction funds after Hurricane Maria from the St. Regis.*

74.     Upon information and belief, Fahad directly or indirectly formed a shell company, Caribe Builders LLC, together with one of his attorneys, and President of Caribe Builders, Alfredo Umpierre, to provide roofing services to the St. Regis after Hurricane Maria.

75.     In the process, Caribe Builders LLC billed the St. Regis $4,600,000 for roofing work, despite Fahad nor his attorney having any experience in roofing or construction-related work. Upon information and belief, Caribe Builders did not have any employees and the company simply subcontracted the work it was tasked to perform and pocketed the difference between the $4,600,000 he billed the St. Regis and the amount he paid a subcontractor.

*Fahad's scheme to steal $8 million from his partner in Condado Duo.*

76.     Fahad controlled FG Hospitality LLC and used it to embezzle approximately $8,000,000 from his equal partner regarding a 7.6% stake in Duo Condado JV Holdings LLC ("Condado Duo"). As part of the scheme, he instructed the Paulson Entities to wire dividends rightfully belonging to Condado Hotel Owners LLC ("Condado Hotel Owners"), of which he was

a 50% owner, to FG Hospitality, of which he as 100% owner. This diversion of funds enabled Fahad to cheat his equal partner out of $8,000,000 and secure the entire $15,800,000 disbursement entirely for himself.  As part of that scheme, Fahad never disclosed to Paulson that Condado Hotel Owners was the rightful owner of the 7.6% stake in the Condado Duo.

77.     Instead, Fahad made material misrepresentations of fact to the Paulson Entities that FG Hospitality was the 100% owner, inducing Paulson to wire the funds inappropriately to FG Hospitality instead of the rightful owner Condado Hotel Owners. On October 9, 2023, Fahad's partner in Condado Hotel Owners sued Fahad regarding the aforementioned misappropriation of funds in Puerto Rico State Court.

***Fahad's charitable foundation scam.***

78.     Despite Fahad being a self-proclaimed philanthropist, the F&G Family Foundation was a complete fraud. Upon information and belief, this purported non-profit foundation was never legally established. Instead, Fahad structured this fraudulent entity as a corporation and used it for personal expenses benefiting his family, friends, and associates. For example, on June 27, 2022, F&G Family Foundation wired Fahad's friend, Ali Sattar ("Ali"), $360,732 for the down payment of Ali's apartment. The payment to Ali from the Foundation was just the tip of the iceberg of the fraudulent activities carried out under the cover of Fahad's "philanthropy" – the table below highlights just some of the examples of the transfers made from the "Foundation" to Fahad's family and friends in 2022 alone.

| F&G Family Foundation Charitable Donations to Family Members and Friends (2022 Only) | | | |
|---|---|---|---|
| DATE | NAME | DEBIT | REASON |
| | | | |
| 1/24/2022 | Osman Geylan | $   650,000.00 | Family Support |
| 1/27/2022 | Glenn Acevedo | $       3,500.00 | Family Support |
| 2/4/2022 | Evelyn Martinez | $       2,500.00 | Glenda's mother |
| 2/9/2022 | Glenn Acevedo | $   100,000.00 | Two homes purchase |
| 2/22/2022 | Penverne Benoit | $     25,000.00 | Daughter's healthcare |
| 3/12/2022 | Christopher Berlin | $   250,000.00 | Loan |
| 3/15/2022 | Saira Ghaffar | $   100,000.00 | Family support |
| 3/16/2022 | Cash | $     40,000.00 | Donation |
| 3/16/2022 | Fedchenko Vitali | $       9,000.00 | House expense |
| 3/21/2022 | Glendaliz Acevedo | $   100,000.00 | Wife donation |
| 5/17/2022 | Glenn Acevedo | $     30,000.00 | Brother in Law donation |
| 6/27/2022 | Saira Ghaffar | $     10,000.00 | Family support |
| 6/28/2022 | Evelyn Martinez | $       9,750.00 | Family support |
| 6/28/2022 | Ali Sattar | $       4,000.00 | Loan for house purchase payment |
| 6/28/2022 | Ali Sattar | $   356,732.00 | Loan for house purchase payment |
| 7/15/2022 | Glenn Acevedo | $     20,000.00 | Family support |
| 9/14/2022 | Munira Ghaffar | $     14,000.00 | Family support |
| 12/21/2022 | Nerissa Aponte | $     10,000.00 | Donation |

*Fahad's tax evasion.*

79.     Aside from facilitating an alleged bribery scheme at his wedding, Fahad also used the opportunity to evade taxes. Specifically, the wedding cost approximately $300,000 and Fahad invoiced those expenses through the hotel's accounts. Instead of directly reimbursing these expenses, or paying for his wedding out of pocket, he allocated pre-tax unpaid commissions that were allegedly owed by the Paulson Entities to pay for his post-tax wedding expenses. In the process, Fahad avoided tax liabilities and misrepresented his income to governmental authorities.

80.     In one of many examples to evade taxes, Fahad, through one his dubious entities, RE Consulting LLC, purchased a $245,000 tax credit using his purported unpaid pre-tax commissions from Bahia Beach CH Development. He offset $222,950 of his pre-tax commissions to purchase the tax credit and further avoid his tax liabilities and misrepresent his income.

*Fahad's insurance frauds.*

81.     On June 2018, Fahad alleged one of his extravagant watches, worth "$100,000", had gone missing at the former Serafina Beach Hotel. To recover the watch, Fahad filed a fraudulent claim to Paulson PRV's insurance schemed through his brother, Amir, who, at the time was the Paulson Entities' co-broker/consultant. According to hotel employees, to support the

fraudulent claim, Fahad forced hotel employees to prepare a false incident report and forced them to book a free night at the hotel thus allowing Fahad to allege that he had stayed at the hotel and inadvertently left his watch in the room. Subsequently, Fahad realized his claim would be unsupported by a free night at the hotel, so he paid approximately $100 to create a fraudulent payment record as if he was paying for the stay at the hotel. In reality, it was all a scheme by Fahad and Amir, harming Paulson and the insurance company for their personal gain.

82.     On July 23, 2018, Fahad received a $75,000.00 payout in relation to that fraudulent claim, the maximum amount per the insurance policy.

83.     Outrageously, Fahad and/or his brother, co-defendant Amir, also caused Paulson PRV to pay his *personal insurance for his private residence* under the Paulson corporate P&C policy. The policy coverage includes two lots owned by Fahad—1125 Seaview Street and 1127 Seaview Street—as well as his swimming pool, personal property, and jewelry. He attempted to camouflage this flagrant abuse by "reimbursing" Paulson a pittance amount relative to the actual cost of this beachfront insurance.

### *Fahad diverts Paulson's properties to himself at deflating prices.*

84.     Fahad, in another brazen act of self-dealing, entered into a purchase and sale agreement for two lots at the St. Regis. The agreement included a series of unauthorized preferential concessions including a discounted price, an increase in lot size, changes to the design and residential structure, and preferential payment timing. Paulson never approved this transaction.

85.     Fahad, through CCBF, acquired another lot at the St. Regis for a reduced price of $1,860,300 when the actual price for that lot was $2,418,390. He unilaterally awarded himself that discount. Moreover, Fahad ordered an increase in the lot size from 5,580 sq/m to 6,131 sq/m. This arrangement was never discussed-with or approved-by Paulson.

86.     On June 11, 2018, Fahad signed a purchase and sale agreement for a unit at the St. Regis. The agreement contemplated a purchase price of $2,901,480, a sale price that was approximately $290,000 lower than the price of identical units. Fahad never paid for the unit yet took possession of the apartment. Subsequently, Fahad sold the unit for $3,700,000 to a third party. He pocketed the profits and did not return the profits to the St. Regis' shareholders, despite him not having paid for the unit he had just sold. Additionally, while Fahad pretended to own the unit, he had Bahia pay for all his personal expenses and upgrades related to the unit in an extremely abusive example of self-dealing. These included, but were not limited to, the following items at the cost of Bahia shareholders:

    a       Cell phone boosters for every room;

    b       Safety boxes in every room;

    c       A parking spot with provision to charge electric cars;

    d       A jacuzzi in the pool;

    e       A professional interior designer to furnish and decorate the unit;

    f       $600,000 paid for furniture to furnish his apartment; and

    g       Cleaning and maintenance services of the interior of the unit, its pool and its pool deck.

87.     In another form of self-dealing and tax fraud, Fahad acquired yet another residential unit at the St. Regis at $3,676,000, when the price was $3,868,000. The difference in price was due to Fahad having deducted what he alleged were pre-tax "commissions" that he was owed in order to not receive them directly and not declare it in tax returns nor pay taxes on those earnings.

88.     Fahad also authorized free brand-new vehicles (as loaners) to friends and associates who did not provide any services that benefited Paulson. He loaned Maseratis to his

wife's clothing designer, Jean Cintron; an Audi to his father-in-law; a Chevrolet Silverado to a reggaeton artist; and another one to his friend Francisco "Paco" López. Similarly, Fahad gave thousands of dollars in unauthorized car discounts to his family and friends including Amir, Glenda, Matt Moncada, Ryan Christiansen, and others.

89.    Fahad also booked hotel rooms for himself, family and friends and did not pay back the expenses incurred. For example, Ali Sattar, his close personal friend, stayed at the Serafina Beach Hotel, another Paulson property, for free for weeks. The estimated cost was in the tens of thousands of dollars.

90.    Upon information and belief, Fahad demanded kickbacks from one of the Paulson Entities' liquor distributors in exchange for accommodating them as a Paulson vendor. Based on statements by an employee of the distributor, Fahad was receiving annual kickbacks of 3.5% on the Paulson Entities' liquor purchases, which total hundreds of thousands of dollars every year. The matter continues to be investigated.

### Fahad and Amir's insurance scams: from extorting local companies to swallowing the business.

91.    Several years ago, Amir Ghaffar relocated to Puerto Rico. He was drawn to the island by the prospect of using his brother's access to the Paulson Entities to enrich himself. Eventually, on August 31, 2020, he secured a work visa (R E3) for services to be performed at a company known as Innoveo, Inc. ("Innoveo"). Upon information and belief, his work visa expired on August 24, 2022.

92.    In or about 2017, Fahad and Amir devised the scheme by which they would enrich themselves at Plaintiffs' expense. The object was simple: to gradually secure a stream of income by becoming the Paulson Entities' sole insurance broker behind Paulson's back. As the Paulson Entities' broker, Amir would become the intermediary between the Plaintiffs and their insurance

companies, earning commissions which were proportional to the premiums paid by Plaintiffs for their insurance coverage. Eventually, Fahad and Amir achieved their goal when Coverisq, a company formed by Amir, became the Plaintiffs' sole insurance broker. The process by which that came to happen, however, lay bare the deviousness to which Fahad and Amir would resort to make money.

93.     In or around late 2016 to early 2017, the Paulson Entities had a well-known insurance brokerage firm, Insurance Broker 1.

94.     At some point during that time, upon information and belief, Fahad approached Insurance Broker 1 and demanded that they bring Amir on board to serve as a "consultant" for their company through Defendant Tygate. [1] Upon information and belief, Fahad threatened Insurance Broker 1 with taking Plaintiffs' business elsewhere if they did not employ Amir. Insurance Broker 1 ultimately rejected Fahad's demand, and, in this manner, blocked Fahad and Amir's attempt to share equally in the commission payments derived by Insurance Broker 1 from brokering Plaintiffs' insurance coverage. Notably, neither Tygate nor Amir had an insurance brokerage license nor provided meaningful insurance-related services. This act of attempted extortion was committed as part of a pattern of racketeering activity.

95.     In light of Insurance Broker 1's reluctance to fall victim to Fahad and Amir's extortionate scheme, Fahad, through misrepresentations and in furtherance of the scheme and artifice to defraud the Paulson Entities in relation to their insurance premiums, fired Insurance Broker 1 and engaged another firm that would yield to his extortion.

96.     On or about March 31, 2017, Fahad, on behalf of Plaintiffs, signed a broker of record letter appointing another local firm, Insurance Broker 2, as the broker for property and

---

[1] At that time, Tygate was known as SGIB Pte. Ltd.

casualty insurance for the Paulson Entities, their subsidiaries, and related entities in Puerto Rico. In that letter, both parties recognized that Amir's company, Tygate, would continue to serve as a "consultant" for Insurance Broker 2. Upon information and belief, Fahad and/or Amir conditioned Plaintiffs' engagement of Insurance Broker 2 on the retention of Amir's company as a consultant. This act of extortion was committed as part of a pattern of racketeering activity.

97.     Because Amir did not have an insurance brokerage license from the relevant American authorities, he could not legally share insurance commission in the United States. Amir and Fahad were aware of that fact and, to conceal the nature of their scheme, they caused the payments received by Amir to be catalogued as "consulting fees."

98.     In or around 2018, employee health and benefits Insurance Broker 3 was also an insurance broker for Plaintiffs. Upon information and belief, sometime in or around 2019, Fahad and Amir summoned the head of Benefits Insurance at Insurance Broker 3 to a meeting at the Vanderbilt Hotel. During that meeting, Fahad and/or Amir instructed representatives from Insurance Broker 3 that, moving forward, Insurance Broker 3 was compelled to share commissions with Amir and disguise them as "consulting fees." Fahad and/or Amir explained that, should Insurance Broker 3 reject this instruction, they would lose all Paulson-related business. This act of extortion was committed as part of a pattern of racketeering activity.

99.     Insurance Broker 3 was told to pay Amir's "consulting fees" through Innoveo, a software company that did not have an insurance license.

100.     The relationship between Paulson PRV and Insurance Broker 3 ended in 2021, when Fahad and/or Amir threatened Insurance Broker 3 with terminating their business relationship if they did not split commission payments on non-Paulson-related entities with Amir. This act of attempted extortion was committed as part of a pattern of racketeering activity.

101.    Upon information and belief, sometime after March 2017, but before November 2019, Tygate obtained an insurance brokerage license.

102.    On November 26, 2019, Fahad sent Insurance Broker 2 another broker of record letter naming Insurance Broker 2 and Tygate the exclusive brokers for Paulson PRV and its subsidiaries for the following three years. Upon information and belief, prior to sending that letter, Fahad and Amir threatened Insurance Broker 2 that, if they did not agree to be co-brokers with Tygate and split insurance commissions equally, they would lose all Paulson-related business.

103.    In or around October 2022, Amir Ghaffar formed Coverisq, a company that was to operate as the Paulson Entities' new and exclusive insurance broker. Coverisq's only material client was Paulson PRV.

104.    Upon information and belief, Fahad received and/or continues to receive monetary disbursements from Coverisq from the inception of the company.

105.    Upon the incorporation of Coverisq, Fahad immediately engaged Coverisq to become the Paulson Entities' sole insurance broker.

106.    Fahad never disclosed to Paulson that he and his brother, Amir, were beneficiaries of Coverisq. For all intents and purposes, Paulson was led to believe that Amir had a leadership position in Innoveo, where Fahad also led Paulson to invest over $12,000,000 under false pretenses.

107.    Through Coverisq, Fahad and Amir were finally able to capture the totality of Paulson Entities' insurance business in Puerto Rico. Fahad fired all of Plaintiffs' prior insurance brokers and retained Coverisq for all of Paulson's insurance needs to secure for themselves a 100% brokerage commission.

108.    Shockingly, since 2022, Paulson PRV paid over $48,000,000 in insurance premiums and over $5 million dollars in commissions to Coverisq. The premiums were exponentially greater than the premiums paid prior to engaging Coverisq. This astronomical amount shows the sickening extent of Fahad's self-dealing, deceit, misrepresentation, fraud, and theft from the Paulson entities.

109.    Upon information and belief, Fahad and/or Amir knowingly and willfully structured the premium costs and/or the insurance program for Paulson PRV in a fraudulent manner to earn higher commissions. Thus, when Coverisq invoiced Plaintiffs, those invoices contained material misrepresentations about the actual market-driven cost of Plaintiffs' insurance policies. These material misrepresentations were made as part of a scheme and artifice to defraud the Plaintiffs by obtaining commissions on artificially and illegally inflated premiums.

110.    The scheme and artifice to defraud was carried out by Fahad, Amir, Aponte, Tygate, and Coverisq, who acted as an association-in-fact enterprise at all times relevant to this Complaint.

111.    At all times relevant to this Complaint, the communications related to Plaintiffs' insurance services, including the transmission of communications containing information regarding fraudulently inflated insurance premiums, were sent via electronic mail or regular mail that traveled in interstate commerce.

112.    Each of the following mailings traveled in interstate commerce, was sent in furtherance of the insurance-related scheme and artifice to defraud the Paulson Entities, and enrich Amir and Fahad, and forms part of a pattern of racketeering activity.

     a.    On June 3, 2023, Fahad sent Paulson an email falsely alleging that the arrangement with Amir was saving the Paulson Entities money and that changing insurance brokers would "massively backfire."

b.    On July 7, 2023, Amir sent Paulson an email containing Coverisq's summary of services, a document which included falsely inflated costs of insurance.

113.   At all times relevant to this Complaint, upon information and belief, Nerissa, at the time an employee of the Paulson Entities, knowingly assisted Fahad in all matters relating to the scheme and artifice to defraud targeting the Paulson Entities' insurance business.

***Fahad embezzles monies belonging to the Paulson Entities to finance his lifestyle of excesses.***

114.   Between at least 2021 and 2023, Fahad knowingly and willfully embezzled millions of dollars from Plaintiffs' accounts to fund his lavish lifestyle.

115.   Despite being handsomely compensated for his work for Paulson, Fahad knowingly and willfully misappropriated corporate funds through several schemes to achieve his illegal goals. One such scheme was causing his personal American Express credit card to be reimbursed by the Paulson Entities. In total, Fahad had 22 American Express credit cards tied to his personal accounts and used them and/or assigned them to other team members as part of his efforts to conceal the nature of his transactions and blend his personal transactions with others to be reimbursed.

116.   Fahad embezzled corporate funds for his personal use by causing the Paulson Entities to pay his personal American Express credit card with Plaintiffs' money. Because Fahad was essentially the senior manager in Puerto Rico, Paulson's Puerto Rico-based employees never questioned his directives. Abusing this blind trust, Fahad would order employees to reimburse his personal expenses, making possible Fahad's embezzlement of funds from the Paulson Entities for personal use. Fahad would often claim these expenses were "business expenses," but no receipts or supporting documents were ever provided by Fahad.  These so-called business expenses were never previously approved by Paulson and served no legitimate business purpose to the Paulson Entities. The term "business expense" was a deliberate falsehood used to shield his obvious

embezzlement of corporate funds. Some examples of these illegal reimbursements for extravagant personal expenses include, but are not limited to:

a       On July 31, 2022, Fahad charged $20,000 to the Paulson Entities for his personal nightclubbing, drinking and partying in the span of a single night at the Omnia Nightclub in Las Vegas.

b       On June 20, 2019, Fahad went clubbing with friends at the Marquee nightclub in New York, spending over $8,000 and charged it to the Paulson Entities.

c       On January 9, 2023, Fahad traveled to Los Angeles to attend a Wisin & Yandel concert and unconscionably charged the Paulson Entities over $1,500 for his personal tickets.

d       On September 30, 2022, Fahad outrageously spent over $45,000 for personal shopping at the Chanel boutique in New York City and billed it to Paulson as a business expense.

e       Incredibly, on December 3, 2021, while on a personal vacation to St. Barths, Fahad spent over $20,000 in Louis Vuitton and again charged it to Paulson as a business expense. This was not the first time Fahad went on a shopping spree at Louis Vuitton in St. Barths and charged his personal lavish spending to Paulson. In May 2021, he spent over $43,000 at Louis Vuitton in St. Barths. On September 23, 2021, he spent $17,944 at Louis Vuitton in St. Barths. On October 2, 2021, Fahad spent $7,084 at Louis Vuitton in St. Barths. On November 27, 2021, another $10,135 at Louis Vuitton in St. Barths. In total, in just 2021, Fahad charged over

$102,000 in personal Louis Vuitton purchases in St. Barths to Paulson and billed it as business expenses.[1]

f       On February 6th, 2023, Fahad charged the Paulson Entities for his personal vacation to Dubai. Specifically, he charged the corporation $14,000 to stay at the luxurious Burj Al Arab Hotel.

g       In a further abuse of his privilege, on April 30th, 2022, Fahad charged the Paulson Entities another $10,000 for an extravagant meal at the Seccarelli Ristorante in San Juan.

h       Similarly, on May 31st, 2022, Fahad charged the Paulson Entities close to $4,000 for a meal at Carbone in Miami.

i       On March 10, 2023, Fahad charged a $1,000 limousine ride to the Paulson Entities.

j       In total, between 2018 and 2023, Fahad charged $3,400,000 of his personal expenses to the Paulson Entities. Each one of these charges constitutes a separate incident of knowing and willful embezzlement of funds and, collectively, constitute a pattern of racketeering activity.

117.    Incredibly, Fahad also caused the Paulson Entities' reimbursement of Nerissa's personal American Express credit card. In total, between 2018 and 2023, the Paulson Entities reimbursed $360,000 in personal expenses for Nerissa.

118.    As if invoicing his personal expenses directly to the companies and using company accounts to pay his personal credit cards was not shameless enough, Fahad also formed a shell company, Defendant Thinking Ahead, whose sole member is Fahad, to misrepresent his

---

[1] Obviously, the Paulson Entities reject the contention that expenses in Chanel or Louis Vuitton could in any way be legitimate business expenses. This is another patent falsehood repeated by Fahad.

personal expenditures as reasonable corporate expenses incurred by the company. In one instance, he chartered a private jet to fly to Las Vegas for $120,000 each way and charged it to the Paulson Entities, disguised as a payment to Thinking Ahead. In addition to the $240,000 private air charge, Fahad also charged the Paulson Entities $20,000 in liquor, nightclub, and restaurant expenses. By requesting these reimbursements through Thinking Ahead, Fahad was deliberately misrepresenting the nature of his expenses as part of a scheme and artifice to defraud the Paulson Entities and obtain monies to fund his personal expenses. Upon information and belief, Thinking Ahead is nothing but another shell company with no meaningful and legitimate activities. Each one of these charges constitutes a separate incident of knowing and willful embezzlement of funds and, collectively, constitute a pattern of racketeering activity.

119.    Fahad also hid another $400,000 in other private jet charges through disguised invoices to Thinking Ahead.

120.    Fahad's schemes to defraud Paulson had no limits. He also caused his personal domestic staff to be placed on one of the Paulson Entities' payrolls, thus avoiding his obligation to compensate his domestic staff and pay the corresponding payroll taxes.

121.    Specifically, prior to his termination, Fahad devised a scheme and artifice to defraud whereby he would cause certain domestic employees working in his personal residence to be misrepresented on AIP PR's books as employees of AIP PR. This resulted in AIP PR paying the salaries and related taxes corresponding to those individuals, despite those individuals not providing any services to AIP PR. Specifically, six domestic service employees working at Fahad's primary residence were added to AIP PR's payroll at Fahad's instructions, including his babysitters, maids, handymen, and other housekeepers. These employees were: Jorge Aleman-de Jesus, Carmen Terrero-Perez, Gweneth Stapleton-Liburd, Ingrid Rosario-Pimentel, Marianela

Martinez-Rojas, and Ana Tiburcio-Sanchez. Fahad abused his access and control over the Paulson Entities' affairs in order to cause the companies to pay for his personal staff without disclosing this to Paulson nor obtaining Paulson's authorization or consent.

122.    Another modality whereby Fahad misappropriated Paulson Company funds for his own personal benefit was by having the Paulson Entities pay for vehicles, insurance, and cellular phone service, including an expensive encrypted phone line, for him and his close allies.

123.    In one instance, Fahad provided a luxurious Audi Q3to his father-in-law, Glen, for free. Although Glen was never a Paulson employee, Fahad charged Bahia for the cost of the car, maintenance, and insurance coverage. Bahia Beach CH Developments LLC is now also paying for repairs on the car, as Glen was in a car wreck prior to returning the vehicle. Glen was also included in the Paulson Entities' insurance policies, and in the AIP insurance pool since 2018. Glen unjustly benefitted from over $20,000 related to the use of the vehicle and his insurance coverage.

124.    Shockingly, in a further abuse of his privilege, since at least 2018, Fahad had Paulson pay for the personal cellphones for his household employees, relatives, and friends, including maids, his mother, and Glenda. The aggregate cost to the Paulson Entities was over $19,000.00.

125.    Yet another scheme by which Fahad stole from Paulson was by running exorbitant tabs at the Paulson Hotels for large dinners, parties, nightclubs, etc. and never reimbursing the personal expenses that he incurred.

126.    Between 2020 to 2023, Fahad consumed over $440,000 in the Vanderbilt Hotel, after his management discounts, but never reimbursed Paulson for these personal expenses. Each charge for which Fahad did not reimburse the Paulson Entities constitutes a separate incident of

knowing and willful embezzlement of funds and, collectively, constitute a pattern of racketeering activity.

127.    From 2020 to 2023, Fahad consumed over $65,000 in La Concha, after his management discounts, but never reimbursed Paulson for these personal expenses. Each charge for which Fahad did not reimburse the Paulson Entities constitutes a separate incident of knowing and willful embezzlement of funds and, collectively, constitutes a pattern of racketeering activity.

128.    Although Fahad was not an owner of St. Regis Bahia Beach, he schemed to get a 50% owner's discount for himself even while the real owners Paulson, Muñoz, and Sánchez, only received 20% discounts. Despite this brazen abuse of his position, he still did not reimburse the hotel for over $90,000 of personal food and beverage expenses incurred between 2018 and 2023. Each charge for which Fahad did not reimburse the Paulson Entities constitutes a separate incident of knowing and willful embezzlement of funds and, collectively, constitutes a pattern of racketeering activity.

129.    In addition, Fahad illegally funded his personal expenditures, and that of his close allies, with corporate funds provided from St. Regis Bahia Beach Resort. Some examples include, but are not limited to:

>          a       Nerissa, Fahad's assistant, had her lavish wedding at the St. Regis. Fahad charged the entire cost of the wedding to the owners' expense account at Bahia, in effect having the true owners, unbeknownst to them, pay for his assistant's wedding.
>
>          b       Disgracefully, Fahad caused Bahia to pay for personal maintenance and personal landscaping services at his private residence in San Juan and at his

brother's and mother's homes in San Juan. The cost of these services is approximately $370,000.00.

c       Rather than personally paying his homeowners' association costs related to his personal residence at Bahia, as all other residents and owners do, Fahad had Bahia Resort pay his approximately $60,000.00 in personal dues.

d       Fahad charged the cost of furnishing his St. Regis' Ocean Drive apartment unit to Bahia corporate. The furniture expenses cost Bahia shareholders roughly $700,000.

e       Fahad charged Bahia for his housekeeping, spa treatments for Glenda, tennis lessons, and other miscellaneous expenses totaling approximately $136,000.

f       Each one of these charges constitutes a separate incident of knowing and willful embezzlement of funds and, together, constitute a pattern of racketeering activity.

130.    Fahad had Paulson entities pay for his personal security, intelligence, and investigative services. In an attempt to clean-up his corrupt and abhorrent reputation, Fahad engaged with, among other professionals, Vantage Intelligence, for personal services including analysis on his own image and support against negative articles, among other things. To conceal the cost of Vantage's services, Fahad caused the Paulson Entities' lawyers to retain Vantage on his behalf. The Vantage bills were sent directly to the law firm and remained undetected until Fahad's termination. In total, Paulson entities paid approximately $110,000 to Vantage Intelligence for services that were solely for the benefit of Fahad's efforts to salvage his horrible reputation.

131.     At all times relevant to this Complaint, Fahad and Nerissa were acting as an association-in-fact enterprise engaged in knowing and willful embezzlement of corporate funds for personal use to the detriment of Plaintiffs.

132.     At all times relevant to this Complaint, Nerissa was Fahad's trusted assistant. Though also a former employee of Paulson PRV, Nerissa knowingly assisted Fahad in the orchestration of the scheme to embezzle funds from Paulson PRV.

133.     Fahad never disclosed the extent or the nature of his misappropriation of corporate assets to Paulson.

**_The Innoveo scheme._**

134.     Fahad used his position at the Paulson Entities not only to enrich himself through a pattern of racketeering activity, but to enrich his brother, Amir, and his sisters, Saira and Farah.

135.     Fahad and Amir arranged for Innoveo, the software company formed and controlled by Amir, to provide software services to Paulson that the company was ill-equipped to provide. Upon information and belief, Fahad and Amir wanted to artificially inflate the financials of Innoveo through the Paulson entity business in order to increase the value of the company.

136.     Throughout the relevant time period, Innoveo received approximately $3,000,000 from different Paulson Entities, including, but not limited to, F40, Auto Grupo, the Condado Duo, and the St. Regis.

137.     Ultimately, the "services" provided by Innoveo were deficient and essentially useless to the Paulson Entities. In fact, after Fahad's termination, local management expressed their desire to discontinue the services from Innoveo, as the services were essentially worthless.

138.     Nevertheless, using Innoveo's inflated financials, propped-up by Paulson Company business that Fahad unilaterally assigned to Innoveo, Fahad procured a $12,197,885 investment

from Paulson in Innoveo. Aside from using Innoveo's artificially inflated financials to procure the investment, Fahad also misrepresented to Paulson that the company's primary business was selling insurance software, when, unbeknownst to Paulson, the company was providing general "IT services" to Paulson's very own entities. These misrepresentations were knowingly made by Fahad in order to fraudulently induce Paulson to invest in Innoveo, a company which, upon information and belief, is owned and controlled by Fahad and his brother Amir.

139.    When Paulson found out about the extent of Fahad and Amir's misrepresentations regarding Innoveo, and the fact that he had been induced to invest under false pretenses, Fahad assured Paulson that he would return his investment. Unsurprisingly, this was a false promise, as Fahad has not returned any funds related to his investment in Innoveo to Paulson.

140.    At all times relevant to this Complaint, Fahad and Amir were acting as an association-in-fact enterprise engaged in a scheme and artifice to defraud Paulson by securing an investment in Innoveo based on false pretenses.

141.    At all times relevant to this Complaint, Fahad communicated with Paulson regarding the Innoveo investment through electronic mail that traveled in interstate commerce or caused electronic mails that traveled in interstate commerce to be sent in furtherance of the scheme to defraud Paulson with respect to his investment in Innoveo.

142.    These are some of the mailings that traveled in interstate commerce and were in furtherance of the scheme and artifice to defraud the Paulson Entities by inducing them to invest in Innoveo under false pretenses.

> a.    On April 6, 2021, Fahad emailed Paulson the "Final Closing Documents" related to Paulson PRV's investment in Innoveo. The email contained the terms and conditions of the investment.

b.      On April 8, 2021, Fahad caused an email to be sent to Paulson by a Paulson Entity employee which requested that Paulson sign a wire transfer form in order to transfer the investment sum to Innoveo. The sending of this email was foreseeable to Fahad and his co-conspirators as part of the execution of the scheme and artifice to defraud.

143.    Similarly, the investment was made electronically via wire transfers.

**_The Ghaffar sisters get their cut._**

144.    Evidently not satisfied with the fact that Amir was his only sibling getting rich on the Paulson's dime, Fahad brought his sister, Saira, aboard to become a St. Regis vendor.

145.    Between the years 2021 through 2023, at Fahad's direction, Saira sold cheap rugs, art, and LED lights at inflated prices to the St. Regis Resort, receiving payments of approximately $543,315.86. Fahad and/or Saira inflated the price of the items she sold to the St. Regis in order to pocket additional commissions and/or profits from the inflated costs. For example, a rug that Saira sold to the St. Regis for $6,300 was replaced by a rug of far superior quality from a local vendor for $1,500.

146.    At all times relevant to this Complaint, Fahad, Saira, and Nerissa were acting as an association-in-fact enterprise engaged in a scheme and artifice to defraud the Paulson Entities by knowingly and willfully selling items at inflated prices, misrepresenting the true cost to the seller, in order to illegally pocket higher commissions.

147.    Fahad's other sister, Farah, not to be outdone by her siblings, schemed with Fahad to sell IT devices and services through Defendant Syber at inflated prices to pocket the increased commissions. Without disclosing the obvious conflict of interest, Fahad engaged his sister's

company and caused payments of more than $100,000 to be issued in the name of Defendant Syber in 2023.

148.    At all times relevant to this Complaint, Fahad and/or Saira communicated with the Paulson Entities regarding the sale of and payment for these items through electronic mail that traveled in interstate commerce.

149.    The list of emails that traveled in interstate and were sent in furtherance of Fahad and Saira's scheme and artifice to defraud the Paulson Entities includes, but is not limited to:

    a.    On June 14, 2023, Fahad sent Paulson an email falsely alleging that the Paulson Entities would save 30% on the goods sold by Saira.

    b.    On July 3, 2023, Fahad sent Paulson an email where he attached invoices containing the goods sold by Saira at the illegally inflated prices at which she sold them to the Paulson Entities.

**The Dynamics Payments scheme.**

150.    In this instance, Fahad abused his position at the Paulson Entities to direct payment processing fees to a company in which he had an interest, so he could boost their sales and sell the company at a profit.

151.    Fahad and three of his associates bought a 30% stake in Dynamics Payments ("Dynamics") for $4,000,000 in late 2018. The deal was for Fahad to replace Paulson's long-term payments provider, Evertec, at all its hotel properties with Dynamics.

152.    Paulson was unaware that Fahad replaced the Plaintiffs' long-term payments provider with a company in which he had an ownership stake.

153.    The retention of Dynamics by the Paulson Entities would cause Dynamics growth to artificially accelerate causing both its growth rate and sale multiple, to rise. Despite Fahad

owning 0% of Paulson PRV, he forced the Paulson entities to use Dynamics causing Dynamics' revenues to grow materially faster than they would without the sales from Paulson affiliates.

154.    Based on this high growth, Fahad sold his stake in Dynamics at the peak of the company's valuation in 2021 and received $35,000,000.

155.    Because the Paulson Entities were the source of Dynamics' growth and valuation increase, the $35,000,000 gain produced by Fahad appropriately belongs to Paulson.

### *Fahad's framing plot to indict a former employee that sued him.*

156.    In October 2021, an ex-employee of the Paulson Entities, Enrique "Ricky" Diaz sued Fahad for what he alleged was a pattern of discrimination by Fahad.

157.    The lawsuit contained several salacious allegations regarding Fahad, including that he *gifted* a Puerto Rico local court judge, Jorge Diaz-Reveron, a brand-new BMW in exchange for the judge facilitating a meeting between Fahad and the former Governor of Puerto Rico, Wanda Vazquez-Garced, the judge's wife.

158.    Fahad was irate when the lawsuit was made public. According to sworn statements that were secured as part of the lawsuit, Fahad tried to discredit the plaintiff and connived a way to ruin Ricky Diaz's life.

159.    Fahad hired an investigator to try and find ways to discredit Diaz. At a meeting between the investigator, Fahad, and Fahad's attorney, the investigator informed Fahad that he had been unable to secure damaging information about Ricky. Dissatisfied, Fahad devised a plan and offered the investigator $60,000.00 to plant a kilo of cocaine in Ricky's car, call the authorities, and have the authorities arrest and indict Ricky for narcotics possession. In doing so, Fahad would destroy Ricky.

***Fahad is a risk of flight.***

160.    Fahad was born in Pakistan, moved to the United States, settled in Florida, moved to New York, and is now a resident of Puerto Rico. He is a man with substantial foreign ties and, given his substantial financial resources, a great deal of which were misappropriated from the Paulson Entities or were otherwise procured by fraud and/or deceit, he presents a risk of flight to avoid facing the factual allegations in this Complaint.

161.    Since his termination from the Paulson Entities, Fahad has been scheming for ways to flee the jurisdiction and relocate elsewhere. Specifically, Fahad has been petitioning the pertinent authorities in Antigua for citizenship in order to be able to move freely to and from Antigua.[1]

## VI.    STATUTE OF LIMITATIONS

162.    The RICO statute does not contain an express limitations period. However, the Supreme Court has held that a four-year statute of limitations period applies to all civil RICO actions. *See Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987). As reflected by the incident dates above, Plaintiffs' civil RICO claim is timely, as it is being filed within four years of the acts giving rise to the cause of action.

163.    Similarly, Paulson learned of the tortious and unlawful actions of the defendants, as well as the injuries caused by them to Paulson, well within one year of filing this Complaint. Thus, Plaintiff's tort claims are also timely filed. P.R. Laws Ann. § 5298; *Gonzalez–Perez v. Hosp. Interamericano De Medicina Avanzada*, 355 F.3d 1, 2 (1st Cir. 2004).

---

[1] The Plaintiffs reserve the right to seek pre-judgment attachment against Fahad's assets in Puerto Rico pending the final adjudication of this action.

## VII.   CAUSES OF ACTION

### COUNT I—The scheme to enrich Glenda through GGSG
### RICO Section 1962(a) and 1962(d)
**Plaintiffs Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC**
**Defendants Fahad Ghaffar, Glendaliz Acevedo-Martinez, Nerissa Aponte, and GGSG**

164.   The allegations of paragraphs 1 through 163 are incorporated by reference as if re-alleged herein.

165.   Plaintiffs Duo Condado JV Holdings LLC and Bahia Beach Holding Company LLC are enterprises engaged in and whose activities affect interstate commerce, as the products and services purchased to operate their hotel investments require transactions that affect interstate commerce.

166.   Defendants Fahad Ghaffar, Glendaliz Acevedo-Martinez, Nerissa Aponte, and GGSG voluntarily entered into an agreement to participate in an endeavor which, if completed, would constitute a violation of the RICO statute. The aforementioned defendants agreed to facilitate the operation of the association-in-fact enterprise through a pattern of racketeering activity and agreed for at least one of the members of the conspiracy to commit at least two predicate acts, in violation of 18 U.S.C. § 1962(d).

167.   Defendants Fahad Ghaffar, Glendaliz Acevedo-Martinez, Nerissa Aponte, and/or GGSG devised a scheme and artifice to defraud Plaintiffs Duo Condado JV Holdings LLC and Bahia Beach Holding Company LLC whereby Fahad, Glenda, Nerissa, and GGSG furthered the financial interests of the enterprise through a pattern of racketeering activity, including wire fraud, as detailed in Paragraphs 24 through 42 and 49 through 70 of this Complaint, thereby causing damages to Plaintiffs Duo Condado JV Holdings LLC and Bahia Beach Holding Company LLC.

168.     At all times relevant to this count, Defendants Fahad Ghaffar, Glendaliz Acevedo-Martinez, Nerissa Aponte, and GGSG operated as an association-in-fact enterprise that associated on an ongoing basis and acted as a continuing unit in pursuit of the goals of the enterprise, which included enriching its members by way of a scheme and artifice to defraud and obtain money from Plaintiffs Duo Condado JV Holdings LLC and Bahia Beach Holding Company LLC.

169.     In turn, Defendants Fahad Ghaffar, Glendaliz Acevedo-Martinez, Nerissa Aponte, and GGSG have used and invested the income they derived through the pattern of racketeering activity targeting Plaintiffs to further their operations, in violation of 18 U.S.C. § 1962(a).

170.     As a direct and proximate result of the defendants' racketeering activities, Plaintiffs have been injured in their business and property in an amount reasonably estimated to be in excess of $3,200,000.

**WHEREFORE** Plaintiffs Duo Condado JV Holdings LLC and Bahia Beach Holding Company LLC respectfully request the Court find Defendants Fahad Ghaffar, Glendaliz Acevedo-Martinez, Nerissa Aponte, and GGSG LLC jointly and severally liable to them and enter judgment in their favor for $9,600,000, along with attorneys' fees and costs, pursuant to Section 1964(c) of RICO.

### COUNT II – Fahad and Amir's insurance scams.
### RICO Section 1962(a) and 1962(d)
### Plaintiff Paulson PRV Holdings LLC
### Defendants Fahad Ghaffar, Amir Ghaffar, Nerissa Aponte Coverisq, and Tygate.

171.     The allegations of paragraphs 1 through 163 are incorporated by reference as if re-alleged herein.

172.     Paulson PRV is an enterprise engaged in and whose activities affect interstate commerce, as the products and services purchased to operate its investments require transactions that affect interstate commerce.

173.    Defendants Fahad Ghaffar, Amir Ghaffar, Nerissa Aponte, Coverisq, and Tygate voluntarily entered into an agreement to participate in an endeavor which, if completed, would constitute a violation of the RICO statute. The aforementioned defendants agreed to facilitate the operation of the association-in-fact enterprise through a pattern of racketeering activity and agreed for at least one of the members of the conspiracy to commit at least to predicate acts, in violation of 18 U.S.C. § 1962(d).

174.    Defendants Fahad Ghaffar, Amir Ghaffar, Nerissa Aponte, Coverisq, and/or Tygate devised a scheme and artifice to defraud Plaintiff Paulson PRV whereby Fahad, Amir, Nerissa, Coverisq, and Tygate furthered the financial interests of the enterprise through a pattern of racketeering activity, including wire fraud, as detailed in Paragraphs 24 through 42 and 91 through 113 of this Complaint, thereby causing damages to Plaintiff Paulson PRV.

175.    At all times relevant to this count, Defendants Fahad Ghaffar, Amir Ghaffar, Nerissa Aponte, Coverisq, and Tygate operated as an association-in-fact enterprise that associated on an ongoing basis and acted as a continuing unit in pursuit of the goals of the enterprise, which included enriching its members by way of a scheme and artifice to defraud and obtain money from Plaintiff Paulson PRV.

176.    In turn, Defendants Fahad Ghaffar, Amir Ghaffar, Nerissa Aponte, Coverisq, and Tygate have used and invested the income they derived through the pattern of racketeering activity targeting Paulson to further its operations, in violation of 18 U.S.C. § 1962(a).

177.    As a direct and proximate result of the defendants' racketeering activities, Plaintiffs have been injured in their business and property in an amount reasonably estimated to be in excess of $24,000,000.

**WHEREFORE** Plaintiff Paulson PRV respectfully requests the Court find Defendants Fahad Ghaffar, Amir Ghaffar, Nerissa Aponte, Coverisq, and Tygate jointly and severally liable to it and enter judgment in its favor for $72,000,000, along with attorneys' fees and costs, pursuant to Section 1964(c) of RICO.

### COUNT III— Fahad embezzles monies belonging to the Paulson Entities to finance his lifestyle of excesses.
### RICO Section 1962(a) and 1962(d)
**Plaintiffs AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, Regency Acquisition LLC**
**Defendants Fahad Ghaffar, Nerissa Aponte, and Thinking Ahead LLC**

178.    The allegations of paragraphs 1 through 163 are incorporated by reference as if re-alleged herein.

179.    Plaintiffs AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, and Regency Acquisition LLC are enterprises engaged in and whose activities affect interstate commerce, as the products and services purchased to operate their hotel investments require transactions that affect interstate commerce.

180.    Defendants Fahad Ghaffar, Nerissa Aponte, and Thinking Ahead LLC voluntarily entered into an agreement to participate in an endeavor which, if completed, would constitute a violation of the RICO statute. The aforementioned defendants agreed to facilitate the operation of the association-in-fact enterprise through a pattern of racketeering activity and agreed for at least one of the members of the conspiracy to commit at least to predicate acts, in violation of 18 U.S.C. § 1962(d).

181.    Defendants Fahad Ghaffar, Nerissa Aponte, and Thinking Ahead LLC devised a scheme and artifice to defraud Plaintiffs AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, and Regency Acquisition LLC whereby Fahad, Nerissa, and Thinking Ahead furthered the financial interests of the enterprise through a

pattern of racketeering activity, including embezzlement and wire fraud, as detailed in Paragraphs 24 through 42 and 114 through 133 of this Complaint, thereby causing damages to Plaintiffs AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, and Regency Acquisition LLC.

182.    At all times relevant to this count, Defendants Fahad Ghaffar, Nerissa Aponte, and Thinking Ahead LLC operated as an association-in-fact enterprise that associated on an ongoing basis and acted as a continuing unit in pursuit of the goals of the enterprise, which included enriching its members by way of a scheme and artifice to defraud and obtain money from Plaintiffs AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, and Regency Acquisition LLC.

183.    In turn, Defendants used and invested the income they derived through the pattern of racketeering activity targeting Plaintiffs AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, and Regency Acquisition LLC to further the operations of the enterprise, in violation of 18 U.S.C. § 1962(a).

184.    As a direct and proximate result of Defendants Fahad Ghaffar, Nerissa Aponte, and Thinking Ahead LLC's racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, and Regency Acquisition LLC have been injured in their business and property in an amount reasonably estimated to be in excess of $6,600,000.

**WHEREFORE** Plaintiffs AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, and Regency Acquisition LLC respectfully request the Court find Defendants Fahad Ghaffar, Nerissa Aponte, and Thinking Ahead LLC

jointly and severally liable to them and enter judgment in their favor for $19,800,000, along with attorneys' fees and costs, pursuant to Section 1964(c) of RICO.

**COUNT IV— The Innoveo scheme.**
**RICO Section 1962(a) and 1962(d)**
**Plaintiff Paulson PRV Holdings LLC**
**Defendants Fahad Ghaffar and Amir Ghaffar**

185.    The allegations of paragraphs 1 through 163 are incorporated by reference as if re-alleged herein.

186.    Paulson PRV is an enterprise engaged in and whose activities affect interstate commerce, as the products and services purchased to operate its hotel investments require transactions that affect interstate commerce.

187.    Defendants Fahad Ghaffar and Amir Ghaffar voluntarily entered into an agreement to participate in an endeavor which, if completed, would constitute a violation of the RICO statute. The aforementioned defendants agreed to facilitate the operation of the association-in-fact enterprise through a pattern of racketeering activity and agreed for at least one of the members of the conspiracy to commit at least to predicate acts, in violation of 18 U.S.C. § 1962(d).

188.    Defendants Fahad Ghaffar and Amir Ghaffar devised a scheme and artifice to defraud Plaintiff PRV whereby Fahad and Amir furthered the financial interests of the enterprise through a pattern of racketeering activity, including wire fraud, as detailed in Paragraphs 24 through 42 and 134 through 143 of this Complaint, thereby causing damages to Plaintiff Paulson PRV.

189.    At all times relevant to this count, Defendants Fahad Ghaffar and Amir Ghaffar, operated as an association-in-fact enterprise that associated on an ongoing basis and acted as a

continuing unit in pursuit of the goals of the enterprise, which included enriching its members by way of a scheme and artifice to defraud and obtain money from Plaintiff Paulson PRV.

190.     In turn, Defendants Fahad Ghaffar and Amir Ghaffar have used and invested the income they derived through the pattern of racketeering activity targeting Plaintiffs to further their operations, in violation of 18 U.S.C. § 1962(a).

191.     As a direct and proximate result of the defendants' racketeering activities, Plaintiff Paulson PRV has been injured in its business and property in an amount reasonably estimated to be in excess of $12,197,885 plus interest.

**WHEREFORE** Plaintiff Paulson PRV respectfully requests the Court find Defendants Fahad Ghaffar and Amir Ghaffar jointly and severally liable to it and enter judgment in its favor for $36,593,655, plus interest, along with attorneys' fees and costs, pursuant to Section 1964(c) of RICO.

<u>**COUNT V— The Ghaffar sisters get their cut.**</u>
**<u>RICO Section 1962(a) and 1962(d)</u>**
**Plaintiff Bahia Beach Holding Company LLC**
**Defendants Fahad Ghaffar, Saira Ghaffar, and Nerissa Aponte.**

192.     The allegations of paragraphs 1 through 163 are incorporated by reference as if re-alleged herein.

193.     Plaintiff Bahia Beach Holding Company LLC is an enterprise engaged in and whose activities affect interstate commerce, as the products and services purchased to operate its hotel investments require transactions that affect interstate commerce.

194.     Defendants Fahad Ghaffar, Saira Ghaffar, and Nerissa Aponte voluntarily entered into an agreement to participate in an endeavor which, if completed, would constitute a violation of the RICO statute. The aforementioned defendants agreed to facilitate the operation of the association-in-fact enterprise through a pattern of racketeering activity and agreed for at least one

of the members of the conspiracy to commit at least to predicate acts, in violation of 18 U.S.C. § 1962(d).

195.    Defendants Fahad Ghaffar, Saira Ghaffar, and Nerissa Aponte devised a scheme and artifice to defraud Plaintiff Bahia Beach Holding Company LLC whereby Fahad, Saira, and Nerissa furthered the financial interests of the enterprise through a pattern of racketeering activity, including wire fraud, as detailed in Paragraphs 24 through 42 and 144 through 149 of this Complaint, thereby causing damages to Plaintiff Bahia Beach Holding Company LLC.

196.    At all times relevant to this count, Defendants Fahad Ghaffar, Saira Ghaffar, and Nerissa Aponte operated as an association-in-fact enterprise that associated on an ongoing basis and acted as a continuing unit in pursuit of the goals of the enterprise, which included enriching its members by way of a scheme and artifice to defraud and obtain money from Plaintiff Bahia Beach Holding Company LLC.

197.    In turn, Defendants Fahad Ghaffar, Saira Ghaffar, and Nerissa Aponte have used and invested the income they derived through the pattern of racketeering activity targeting Plaintiff to further their operations, in violation of 18 U.S.C. § 1962(a).

198.    As a direct and proximate result of the defendants' racketeering activities, Plaintiffs have been injured in their business and property in an amount reasonably estimated to be in excess of $543,315.

**WHEREFORE** Plaintiff Bahia Beach Holding Company LLC respectfully requests the Court find Defendants Fahad Ghaffar, Saira Ghaffar, and Nerissa Aponte jointly and severally liable to it and enter judgment in its favor for $1,629,945, along with attorneys' fees and costs, pursuant to Section 1964(c) of RICO.

**COUNT VI**
**Fraud**
**Plaintiffs Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC**
**Defendants Fahad Ghaffar and Glendaliz Acevedo-Martinez**

199.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

200.    "In order to prove fraud under Puerto Rico law, a plaintiff must establish: (1) that a false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3) that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the plaintiff." Microsoft Corp. v. Computer Warehouse, 83 F. Supp. 2d 256, 262 (D.P.R. 2000) (citing Wadsworth, Inc. v. Schwarz–Nin, 951 F.Supp. 314, 323 (D.P.R.1996)).

201.    As alleged in paragraphs 24 through 42 and 49 through 70 of this Complaint, Fahad and Glenda deliberately and with intent to defraud misrepresented to the Paulson Entities and Paulson that the shell company was a necessary component in order to purchase furniture from the European Furnituremaker because the European Furnituremaker did not sell to hotels directly.

202.    Fahad and Glenda deliberately and with intent to defraud misrepresented to the Paulson Entities and Paulson that the engagement of the shell company and the purchasing of furniture from the European Furnituremaker was a cost-saving measure when, in reality, Fahad authorized the arrangement in order to help his marriage with Acevedo and in order to enrich Glenda.

203.    Fahad and Glenda first made these deliberate, false, and intentionally fraudulent misrepresentations in or around April 2021 and continued to make these misrepresentations as recently as June 14, 2023.

204.    Defendants knew that the arrangement with GGSG and Glenda would cause the Paulson Entities to pay hundreds of thousands of dollars more for the European Furnituremaker's

furniture than they would have had to pay had they purchased the furniture directly from the European Furnituremaker.

205.   The Paulson Entities, relying on these false representations, paid GGSG approximately $3.2 million dollars for furniture from the European Furnituremaker, when the Company could have purchased the furniture directly from the European Furnituremaker and saved a substantial amount of money in markups and commissions to GGSG and Glenda.

206.   The commissions were fraudulently procured by Fahad and Glenda.

207.   Plaintiffs are entitled to $6,400,000 in damages, $3,200,000 in actual damages and $3,200,000 in punitive damages stemming from Ghaffar, Acevedo, and the shell company's fraudulent acts.

**WHEREFORE** Plaintiffs Duo Condado JV Holdings LLC and Bahia Beach Holding Company LLC respectfully request the Court find Defendants Fahad Ghaffar and Glendaliz Acevedo-Martinez jointly and severally liable to them for civil fraud and enter judgment in their favor for $6,400,000, along with attorneys' fees and costs.

## COUNT VII
### Fraud
**Plaintiff Paulson PRV Holdings LLC**
**Defendants Fahad Ghaffar and Amir Ghaffar**

208.   The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

209.   "In order to prove fraud under Puerto Rico law, a plaintiff must establish: (1) that false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3) that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the plaintiff." Microsoft Corp. v. Computer Warehouse, 83 F. Supp. 2d 256, 262 (D.P.R. 2000) (citing Wadsworth, Inc. v. Schwarz–Nin, 951 F.Supp. 314, 323 (D.P.R.1996)).

210.    As outlined in Paragraphs 24 through 42 and 91 through 113 of this Complaint, Fahad and Amir misrepresented the true cost of insurance for the Paulson PRV, thus increasing the commissions to be paid to entities under their control, with the intention of defrauding the plaintiff.

211.    Paulson PRV reasonably relied on those false representations and paid the quoted premiums, along with their corresponding commissions, to entities under the control of Fahad and/or Amir.

212.    Fahad and Amir knew that the misrepresentations they made to Paulson PRV regarding their insurance premiums would cause them to pay hundreds of thousands of dollars in fraudulently procured commissions and millions of dollars in inflated premiums.

213.    Plaintiffs are entitled to $48,000,000 in damages, $24,000,000 in actual damages and $24,000,000 in punitive damages stemming from Fahad and Amir's fraudulent acts.

**WHEREFORE** Plaintiff Paulson PRV respectfully requests the Court find Defendants Fahad Ghaffar and Amir Ghaffar jointly and severally liable to it for civil fraud and enter judgment in its favor for $48,000,000, along with attorneys' fees and costs.

<u>**COUNT VIII**</u>
<u>**Fraud**</u>
**Plaintiff Paulson PRV Holdings LLC**
**Defendants Fahad Ghaffar and Amir Ghaffar**

214.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

215.    "In order to prove fraud under Puerto Rico law, a plaintiff must establish: (1) that a false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3) that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the

plaintiff." <u>Microsoft Corp. v. Computer Warehouse</u>, 83 F. Supp. 2d 256, 262 (D.P.R. 2000) (citing

<u>Wadsworth, Inc. v. Schwarz–Nin</u>, 951 F.Supp. 314, 323 (D.P.R.1996)).

216.    As outlined in Paragraphs 24 through 42 and 134 through 143 of this Complaint,

Fahad and Amir misrepresented the financial condition of Innoveo by inflating its economic data

with the intention of fraudulently procuring an investment of over $12,000,000 from John Paulson.

217.    Paulson relied on those false representations about Innoveo's economic condition

and its business and invested the requested funds through Paulson PRV. Paulson PRV suffered

damages as a result of investing its capital in a fraudulently overvalued company, Innoveo.

218.    This investment was fraudulently procured by Fahad and Amir.

219.    Plaintiff Paulson PRV is entitled to $24,395,770 in damages, $12,197,885 in actual

damages and $12,197,885 in punitive damages stemming from Fahad and Amir's fraudulent acts.

**WHEREFORE** Plaintiff Paulson PRV respectfully requests the Court find Defendants

Fahad Ghaffar and Amir Ghaffar jointly and severally liable to it for civil fraud and enter judgment

in its favor for $24,395,770, along with attorneys' fees and costs.

**<u>COUNT IX</u>**
**<u>Fraud</u>**
**Plaintiff Bahia Beach Holding Company LLC**
**Defendants Fahad Ghaffar and Saira Ghaffar**

220.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated

herein.

221.    "In order to prove fraud under Puerto Rico law, a plaintiff must establish: (1) that

false representation was made; (2) that the plaintiff reasonably and foreseeably relied thereon; (3)

that the plaintiff was injured by his reliance; and (4) that the defendant intended to defraud the

plaintiff." <u>Microsoft Corp. v. Computer Warehouse</u>, 83 F. Supp. 2d 256, 262 (D.P.R. 2000) (citing

<u>Wadsworth, Inc. v. Schwarz–Nin</u>, 951 F.Supp. 314, 323 (D.P.R.1996)).

222.    As outlined in Paragraphs 24 through 42 and 144 through 149, between the years 2021 through 2023, at Fahad's instructions, Saira sold cheap rugs, art, and LED lights at fraudulently inflated prices to the St. Regis Resort, receiving payments of approximately $543,315.86.

223.    Fahad and Saira materially misrepresented the true cost and value of the goods sold to the Paulson Entities in order to pocket greater commission payments.

224.    The Paulson Entities, relying on these false representations, paid Saira approximately $543,315.86 for her cheap goods.

225.    The sales commissions pertaining to the goods sold by Saira were fraudulently procured by Fahad and Saira.

226.    Plaintiffs are entitled to $1,086,631.72 in damages, $543,315.86 in actual damages and $$543,315.86 in punitive damages stemming from Fahad and Amir's fraudulent acts.

**WHEREFORE** Plaintiff Bahia Beach Holding Company LLC respectfully requests the Court find Defendants Fahad Ghaffar and Saira Ghaffar jointly and severally liable to it for civil fraud and enter judgment in its favor for $1,086,631.72, along with attorneys' fees and costs.

### COUNT X
### Breach of Fiduciary Duty
### Plaintiff Paulson PRV Holdings LLC
### Defendant Fahad Ghaffar

227.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

228.    "Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." Bonner v. Triple-S Management, et al, No. CV 19-1228 (BJM), 2021 WL 5989772, at *2 (D.P.R. Dec. 17, 2021), aff'd sub nom. Bonner v. Triple-S Mgmt. Corp., 68 F.4th 677 (1st Cir. 2023)

229.    It has been recognized, under Puerto Rico law, that directors and officers of a corporation have a fiduciary relationship with the corporation and with the company's stockholders. Epstein v. F. & F. Mortgage Corp., 106 DPR 211 (1977).

230.    Art. 2.03 of the Puerto Rico General Corporation Act of 2009, 14 L.P.R.A. § 3523. States as follows:

> The authority and the powers conferred upon every corporation organized under the laws of the Commonwealth of Puerto Rico or upon the officers or directors thereof, by law or in the certificate of incorporation or instrument with equal force and validity, or in the corporate bylaws, **shall be enjoyed and must be exercised by the corporation or by the officers or directors, as the case may be, <u>in benefit of the stockholders of the corporation and for the prudent conduct of its businesses and affairs, as well as for the furtherance of its objectives and purposes</u>**.(Emphasis added).

231.    Given the fact that they are "managers of other people's businesses," the aforementioned article imposes on officers and directors the obligation to exercise their powers with the best interests of the corporation as their guiding principle. Rivera Sanfeliz v. Jta. Dir. FirstBank, 193 D.P.R. 38, 52 (2015) (citing C.E. Díaz Olivo, *Corporaciones*, San Juan, Publicaciones Puertorriqueñas, 2005, p. 67).

232.    The aforementioned article establishes the three primary responsibilities that correspond to officers and directors of a corporation. These are: "(1) the obligation to act within the scope of their authority, (2) the duty of diligence, and (3) the duty of loyalty, which in turn "are specifically outlined in Articles 4.03, 4.04, and 4.05 of the law." Id. (citing Díaz Olivo, *op. cit.*, p. 67.)

233.    Article 4.03 of the Corporations Act, 14 L.P.R.A. § 3563, establishes that "[t]he directors and officers shall be bound to dedicate to the affairs of the corporation and to the exercise of their duties the attention and care which in a similar position and under analogous circumstances

a responsible and competent director or officer would execute in applying his/her business judgment in good faith…"

234.    Article 4.04 of the Corporations Act, 14 L.P.R.A. § 3564, establishes that "[w]henever the directors, officers and majority stockholders have personal interests in matters affecting the corporation, they shall be subject to a duty of loyalty which bounds them to act fairly in relation to corporate issues."

235.    In this case, due to the nature of his position at the Paulson Entities, Fahad owed the Paulson Entities a duty of loyalty.

236.    As alleged throughout this Complaint, Fahad breached his fiduciary duty with the Paulson Entities and its shareholders when he engaged in a pattern of racketeering activity, as described above, targeting the plaintiffs and when he engaged in brazen self-dealing, as described above, for his and his close allies' benefit.

237.    Fahad breached his fiduciary duty to the Paulson Entities by making materially false representations to the Paulson Entities and Paulson, and by engaging his unqualified wife and his unqualified siblings, through their companies named as defendants herein, in order to provide services to Plaintiffs, often at inflated rates.

238.    Plaintiffs are entitled to at least $42,000,000 in damages stemming from his breaches of fiduciary duty.

**WHEREFORE** Plaintiff Paulson PRV respectfully requests the Court find Defendant Fahad Ghaffar liable to it for his constant and brazen breaches of fiduciary duty and enter judgment in its favor for $42,000,000 along with attorneys' fees and costs.

**COUNT XI**
**Damages under Puerto Rico's General Tort Statute**
**Plaintiffs Duo Condado JV Holdings LLC, Bahia Beach Holding**
**In the alternative: Against Defendants Glendaliz Acevedo-Martinez and GGSG LLC**

239.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

240.    Article 1536 of the Puerto Rico Civil Code, 31 L.P.R.A. § 10801, establishes that "[t]he person who through fault or negligence causes damage to another, is obliged to restore [the aggrieved party]."

241.    "Breach of duty has, as its name implies, two sub-elements: duty and breach. In most cases, the duty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." Id (citing Ortiz v. Levitt & Sons of P.R., Inc., 1 P.R. Offic. Trans. 407, 101 D.P.R. 290 (1973)).

242.    "Foreseeability is a component of the breach [element] because a defendant only breaches [its] duty if [it] acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." Martinez-Suarez v. Mansiones de Garden Hills Apartments, 556 F. Supp. 3d 1, 14 (D.P.R. 2021), appeal dismissed, No. 21-1808, 2022 WL 1087021 (1st Cir. Jan. 6, 2022).

243.    "In other words, a person breaches the duty of reasonable care when his actions create reasonably foreseeable risks. A plaintiff, then, must show the foreseeable risks created by defendant's acts or omissions in order to carry his burden as to this element of a tort claim." Vazquez-Filippetti, 504 F.3d at 49.

244.    "An actor is negligent if he fails to exercise due diligence to prevent a foreseeable injury." Ayala v. Kia Motor Corp. (D.P.R. Sept. 30, 2022); citing Malave-Felix, 946 F.2d at 972 ("a person is liable for injuries that a prudent person reasonably could anticipate."); see Rivera-

Santiago v. United States, Civ. No. 08-1266, 2009 WL 702235, at *3 (D.P.R. Mar. 11, 2009) (holding that "negligence ensues if the injuries could be foreseen or reasonably anticipated by a reasonable and prudent person.").

245.    Defendants Glendaliz Acevedo-Martinez and GGSG LLC owed the Plaintiffs a duty to conduct themselves as reasonably prudent persons and/or corporate entities. As alleged throughout this Complaint, these defendants engaged in intentional illegal conduct which they knew, or should have known, would injure the plaintiffs.

246.    Accordingly, these defendants are jointly and severally liable to Plaintiffs for the damages they caused.

247.    Plaintiffs are entitled to $3,200,000 in damages stemming from the defendants' tortious acts.

**WHEREFORE** Plaintiffs Duo Condado JV Holdings LLC and Bahia Beach Holding respectfully request the Court find Defendants Glendaliz Acevedo-Martinez and GGSG LLC jointly and severally liable to them for their tortious conduct and enter judgment in their favor for $3,200,000 along with attorneys' fees and costs.

## COUNT XII
### Damages under Puerto Rico's General Tort Statute
**Plaintiffs Paulson PRV Holdings LLC, AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, Regency Acquisition LLC**
**In the alternative: Against Defendant Fahad Ghaffar and Thinking Ahead**

248.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

249.    Article 1536 of the Puerto Rico Civil Code, 31 L.P.R.A. § 10801, establishes that "[t]he person who through fault or negligence causes damage to another, is obliged to restore [the aggrieved party]."

250.    "Breach of duty has, as its name implies, two sub-elements: duty and breach. In most cases, the duty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." Id (citing Ortiz v. Levitt & Sons of P.R., Inc., 1 P.R. Offic. Trans. 407, 101 D.P.R. 290 (1973)).

251.    "Foreseeability is a component of the breach [element] because a defendant only breaches [its] duty if [it] acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." Martinez-Suarez v. Mansiones de Garden Hills Apartments, 556 F. Supp. 3d 1, 14 (D.P.R. 2021), appeal dismissed, No. 21-1808, 2022 WL 1087021 (1st Cir. Jan. 6, 2022).

252.    "In other words, a person breaches the duty of reasonable care when his actions create reasonably foreseeable risks. A plaintiff, then, must show the foreseeable risks created by defendant's acts or omissions in order to carry his burden as to this element of a tort claim." Vazquez-Filippetti, 504 F.3d at 49.

253.    "An actor is negligent if he fails to exercise due diligence to prevent a foreseeable injury." Ayala v. Kia Motor Corp. (D.P.R. Sept. 30, 2022); citing Malave-Felix, 946 F.2d at 972 ("a person is liable for injuries that a prudent person reasonably could anticipate."); see Rivera-Santiago v. United States, Civ. No. 08-1266, 2009 WL 702235, at *3 (D.P.R. Mar. 11, 2009) (holding that "negligence ensues if the injuries could be foreseen or reasonably anticipated by a reasonable and prudent person.").

254.    Defendants Fahad Ghaffar and Thinking Ahead owed the Plaintiffs a duty to conduct themselves as reasonably prudent persons and/or corporate entities. As alleged throughout this Complaint, these defendants engaged in intentional illegal conduct which they knew, or should have known, would injure the plaintiffs.

255.     Accordingly, these defendants are jointly and severally liable to Plaintiff for the damages they caused.

256.     Plaintiffs are entitled to $42,000,000 in damages stemming from their tortious acts.

**WHEREFORE** Plaintiffs Paulson PRV Holdings LLC, AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, and Regency Acquisition LLC respectfully request the Court find Defendants Fahad Ghaffar and Thinking Ahead jointly and severally liable to them for their tortious conduct and enter judgment in their favor for $42,000,000 along with attorneys' fees and costs.

## COUNT XIII
### Damages under Puerto Rico's General Tort Statute
**Plaintiff Paulson PRV Holdings LLC**
**In the alternative: Against Defendants Amir Ghaffar; Coverisq LLC; and Tygate Pte. Ltd.**

257.     The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

258.     Article 1536 of the Puerto Rico Civil Code, 31 L.P.R.A. § 10801, establishes that "[t]he person who through fault or negligence causes damage to another, is obliged to restore [the aggrieved party]."

259.     "Breach of duty has, as its name implies, two sub-elements: duty and breach. In most cases, the duty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." Id (citing Ortiz v. Levitt & Sons of P.R., Inc., 1 P.R. Offic. Trans. 407, 101 D.P.R. 290 (1973)).

260.     "Foreseeability is a component of the breach [element] because a defendant only breaches [its] duty if [it] acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." Martinez-Suarez v. Mansiones de Garden Hills Apartments, 556

F. Supp. 3d 1, 14 (D.P.R. 2021), <u>appeal dismissed,</u> No. 21-1808, 2022 WL 1087021 (1st Cir. Jan. 6, 2022).

261.    "In other words, a person breaches the duty of reasonable care when his actions create reasonably foreseeable risks. A plaintiff, then, must show the foreseeable risks created by defendant's acts or omissions in order to carry his burden as to this element of a tort claim." <u>Vazquez-Filippetti</u>, 504 F.3d at 49.

262.    "An actor is negligent if he fails to exercise due diligence to prevent a foreseeable injury." <u>Ayala v. Kia Motor Corp.</u> (D.P.R. Sept. 30, 2022); citing <u>Malave-Felix</u>, 946 F.2d at 972 ("a person is liable for injuries that a prudent person reasonably could anticipate."); <i>see</i> <u>Rivera-Santiago v. United States</u>, Civ. No. 08-1266, 2009 WL 702235, at *3 (D.P.R. Mar. 11, 2009) (holding that "negligence ensues if the injuries could be foreseen or reasonably anticipated by a reasonable and prudent person.").

263.    Defendants Amir Ghaffar, Coverisq LLC; and Tygate Pte. Ltd. owed Plaintiff a duty to conduct themselves as reasonably prudent persons and/or corporate entities. As alleged throughout this Complaint, these defendants engaged in intentional illegal conduct which they knew, or should have known, would injure the plaintiffs.

264.    Accordingly, these defendants are jointly and severally liable to Plaintiff for the damages they caused.

265.    Plaintiffs are entitled to $36,000,000 in damages stemming from their tortious acts.

**WHEREFORE** Plaintiff Paulson PRV Holdings respectfully requests the Court find Defendants Amir Ghaffar, Coverisq LLC; and Tygate Pte. Ltd. jointly and severally liable to it for their tortious conduct and enter judgment in their favor for $36,000,000 along with attorneys' fees and costs.

## COUNT XIV
### Damages under Puerto Rico's General Tort Statute
### Plaintiff Bahia Beach Holding Company LLC
### In the alternative: Against Defendant Saira Ghaffar

266.     The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

267.     Article 1536 of the Puerto Rico Civil Code, 31 L.P.R.A. § 10801, establishes that "[t]he person who through fault or negligence causes damage to another, is obliged to restore [the aggrieved party]."

268.     "Breach of duty has, as its name implies, two sub-elements: duty and breach. In most cases, the duty is defined by the general rule that one must act as would a prudent and reasonable person under the circumstances." Id (citing Ortiz v. Levitt & Sons of P.R., Inc., 1 P.R. Offic. Trans. 407, 101 D.P.R. 290 (1973)).

269.     "Foreseeability is a component of the breach [element] because a defendant only breaches [its] duty if [it] acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." Martinez-Suarez v. Mansiones de Garden Hills Apartments, 556 F. Supp. 3d 1, 14 (D.P.R. 2021), appeal dismissed, No. 21-1808, 2022 WL 1087021 (1st Cir. Jan. 6, 2022).

270.     "In other words, a person breaches the duty of reasonable care when his actions create reasonably foreseeable risks. A plaintiff, then, must show the foreseeable risks created by defendant's acts or omissions in order to carry his burden as to this element of a tort claim." Vazquez-Filippetti, 504 F.3d at 49.

271.     "An actor is negligent if he fails to exercise due diligence to prevent a foreseeable injury." Ayala v. Kia Motor Corp. (D.P.R. Sept. 30, 2022); citing Malave-Felix, 946 F.2d at 972 ("a person is liable for injuries that a prudent person reasonably could anticipate."); see Rivera-

<u>Santiago v. United States</u>, Civ. No. 08-1266, 2009 WL 702235, at *3 (D.P.R. Mar. 11, 2009) (holding that "negligence ensues if the injuries could be foreseen or reasonably anticipated by a reasonable and prudent person.").

272.    Defendant Saira Ghaffar owed the Plaintiffs a duty to conduct herself as reasonably prudent person. As alleged throughout this Complaint, she engaged in intentional illegal conduct which she knew, or should have known, would injure the plaintiffs.

273.    Accordingly, she is liable to Plaintiffs for the damages she caused.

274.    Plaintiffs are entitled to $543,315 in damages stemming from Saira's tortious acts.

**WHEREFORE** Plaintiff Bahia Beach Holding Company LLC respectfully requests the Court find Defendant Saira Ghaffar liable to it for her tortious conduct and enter judgment in its favor for $543,315 along with attorneys' fees and costs.

**COUNT XV**
**Unjust Enrichment**
**Plaintiffs Paulson PRV Holdings LLC, AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, Regency Acquisition LLC In the alternative: Against Defendants Fahad Ghaffar and Thinking Ahead LLC**

275.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

276.    "The Puerto Rico Supreme Court recognized a cause of action under the unjust or undue enrichment doctrine in <u>Ortiz-Andújar v. Commonwealth of Puerto Rico</u>, 22 P.R. Offic. Trans. 774, 122 D.P.R. 817 (P.R. 1988)." <u>Gov't of Puerto Rico v. Carpenter Co.</u>, 442 F. Supp. 3d 464, 476 (D.P.R. 2020).

277.    The aforesaid doctrine may be invoked "when the laws have not foreseen a situation where a patrimonial shift occurs [and] which shift cannot be rationally explained by the prevalent body of laws." <u>Id</u> at 466; citing <u>Ortiz-Andújar</u>, *supra*.

278.    "To prove a claim for unjust enrichment under Puerto Rico law, '[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause.'" Rivera v. Marriott Int'l, Inc., 456 F. Supp. 3d 330, 339 (D.P.R. 2020); citing Montalvo v. LT's Benjamin Records, Inc., 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (citing Hatton v. Municipality of Ponce, 1994 P.R.-Eng. 909605, 134 D.P.R. 1001, 1994 WL 909605 (1994)); see P.R. LAWS ANN. tit. 31, § 2992.

279.    During the time period relevant to this action, the Paulson Entities paid hundreds of thousands, if not millions, of dollars to Defendants Fahad and/or Thinking Ahead.

280.    The sums paid to these defendants included monies to which they were not entitled, as they were procured through a pattern of racketeering activity, fraud, and/or tortious conduct, as detailed above.

281.    Plaintiffs experienced a corresponding loss of the money they paid the aforementioned defendants as a result of their racketeering activity, fraud, and/or tortious conduct, as detailed above.

282.    The circumstances render Defendants' retention of those benefits inequitable unless they pay Plaintiffs the value of the benefit.

283.    There is no legal just cause that would justify Defendants' enrichment or Plaintiffs' corresponding loss.

284.    Plaintiffs are entitled to a sum to be determined later but reasonably estimated to be at least $50,000,000 in damages stemming from Defendants' unjust enrichment.

**WHEREFORE** Plaintiffs Paulson PRV Holdings LLC, AIP PR Holdings LLC, Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC, SJ Beach PR LLC, and

Regency Acquisition LLC respectfully request the Court find Defendants Fahad Ghaffar and Thinking Ahead jointly and severally liable to them for unjust enrichment and enter judgment in their favor for $50,000,000 along with attorneys' fees and costs.

**COUNT XVI**
**Unjust Enrichment**
**Plaintiff Paulson PRV Holdings LLC**
**In the alternative: Against Defendants Amir Ghaffar, Coverisq LLC, Tygate Pte. Ltd., and Innoveo, Inc.**

285. The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

286. "The Puerto Rico Supreme Court recognized a cause of action under the unjust or undue enrichment doctrine in Ortiz-Andújar v. Commonwealth of Puerto Rico, 22 P.R. Offic. Trans. 774, 122 D.P.R. 817 (P.R. 1988)." Gov't of Puerto Rico v. Carpenter Co., 442 F. Supp. 3d 464, 476 (D.P.R. 2020).

287. The aforesaid doctrine may be invoked "when the laws have not foreseen a situation where a patrimonial shift occurs [and] which shift cannot be rationally explained by the prevalent body of laws." Id at 466; citing Ortiz-Andújar, supra.

288. "To prove a claim for unjust enrichment under Puerto Rico law, '[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause.'" Rivera v. Marriott Int'l, Inc., 456 F. Supp. 3d 330, 339 (D.P.R. 2020); citing Montalvo v. LT's Benjamin Records, Inc., 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (citing Hatton v. Municipality of Ponce, 1994 P.R.-Eng. 909605, 134 D.P.R. 1001, 1994 WL 909605 (1994)); see P.R. LAWS ANN. tit. 31, § 2992.

289.    During the time period relevant to this action, the Paulson Entities paid millions of dollars to Defendants Amir Ghaffar, Coverisq LLC, Tygate Pte. Ltd., and/or Innoveo, Inc.

290.    The sums paid to these defendants included monies to which they were not entitled, as they were procured through a pattern of racketeering activity, fraud, and/or tortious conduct, as detailed above.

291.    Plaintiffs experienced a corresponding loss of the money they paid the aforementioned defendants as a result of their racketeering activity, fraud, and/or tortious conduct, as detailed above.

292.    The circumstances render Defendants' retention of those benefits inequitable unless they pay Plaintiffs the value of the benefit.

293.    There is no legal just cause that would justify Defendants' enrichment or Plaintiffs' corresponding loss.

294.    Plaintiffs are entitled to $36,000,000 in damages stemming from Defendants' unjust enrichment.

**WHEREFORE** Plaintiff Paulson PRV Holdings LLC respectfully request the Court find Defendants Amir Ghaffar, Coverisq LLC, Tygate Pte. Ltd., and Innoveo, Inc. jointly and severally liable to them for unjust enrichment and enter judgment in their favor for $36,000,000 along with attorneys' fees and costs.

### COUNT XVII
### Unjust Enrichment
**Plaintiffs Duo Condado JV Holdings LLC, Bahia Beach Holding Company LLC**
**In the alternative: Against Defendants Glendaliz Acevedo Martinez and GGSG LLC**

295.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

296.     "The Puerto Rico Supreme Court recognized a cause of action under the unjust or undue enrichment doctrine in Ortiz-Andújar v. Commonwealth of Puerto Rico, 22 P.R. Offic. Trans. 774, 122 D.P.R. 817 (P.R. 1988)." Gov't of Puerto Rico v. Carpenter Co., 442 F. Supp. 3d 464, 476 (D.P.R. 2020).

297.     The aforesaid doctrine may be invoked "when the laws have not foreseen a situation where a patrimonial shift occurs [and] which shift cannot be rationally explained by the prevalent body of laws." Id at 466; citing Ortiz-Andújar, *supra*.

298.     "To prove a claim for unjust enrichment under Puerto Rico law, '[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause.'" Rivera v. Marriott Int'l, Inc., 456 F. Supp. 3d 330, 339 (D.P.R. 2020); citing Montalvo v. LT's Benjamin Records, Inc., 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (citing Hatton v. Municipality of Ponce, 1994 P.R.-Eng. 909605, 134 D.P.R. 1001, 1994 WL 909605 (1994)); see P.R. LAWS ANN. tit. 31, § 2992.

299.     During the time period relevant to this action, the Paulson Entities paid millions of dollars to Defendants Glendaliz Acevedo-Martinez and GGSG LLC.

300.     The sums paid to these defendants included monies to which they were not entitled, as they were procured through a pattern of racketeering activity, fraud, and/or tortious conduct, as detailed above.

301.     Plaintiffs experienced a corresponding loss of the money they paid the aforementioned defendants as a result of their racketeering activity, fraud, and/or tortious conduct, as detailed above.

302.    The circumstances render Defendants' retention of those benefits inequitable unless they pay Plaintiffs the value of the benefit.

303.    There is no legal just cause that would justify Defendants' enrichment or Plaintiffs' corresponding loss.

304.    Plaintiffs are entitled to $3,200,000 in damages stemming from Defendants' unjust enrichment.

**WHEREFORE** Plaintiffs Duo Condado JV Holdings LLC and Bahia Beach Holding Company LLC respectfully request the Court find Defendants Glendaliz Acevedo-Martinez and GGSG LLC jointly and severally liable to them for unjust enrichment and enter judgment in their favor for $3,200,000 along with attorneys' fees and costs.

**COUNT XVIII**
**Unjust Enrichment**
**Plaintiff Bahia Beach Holding Company LLC**
**In the alternative: Against Defendant Saira Ghaffar**

305.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

306.    "The Puerto Rico Supreme Court recognized a cause of action under the unjust or undue enrichment doctrine in Ortiz-Andújar v. Commonwealth of Puerto Rico, 22 P.R. Offic. Trans. 774, 122 D.P.R. 817 (P.R. 1988)." Gov't of Puerto Rico v. Carpenter Co., 442 F. Supp. 3d 464, 476 (D.P.R. 2020).

307.    The aforesaid doctrine may be invoked "when the laws have not foreseen a situation where a patrimonial shift occurs [and] which shift cannot be rationally explained by the prevalent body of laws." Id at 466; citing Ortiz-Andújar, *supra*.

308.    "To prove a claim for unjust enrichment under Puerto Rico law, '[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between

loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause.'" Rivera v. Marriott Int'l, Inc., 456 F. Supp. 3d 330, 339 (D.P.R. 2020); citing Montalvo v. LT's Benjamin Records, Inc., 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (citing Hatton v. Municipality of Ponce, 1994 P.R.-Eng. 909605, 134 D.P.R. 1001, 1994 WL 909605 (1994)); see P.R. LAWS ANN. tit. 31, § 2992.

309.    During the time period relevant to this action, the Paulson Entities paid hundreds of thousands of dollars to Defendant Saira Ghaffar.

310.    The sums paid to this defendant included monies to which she was not entitled, as they were procured through a pattern of racketeering activity, fraud, and/or tortious conduct, as detailed above.

311.    Plaintiffs experienced a corresponding loss of the money they paid the aforementioned defendant as a result of her racketeering activity, fraud, and/or tortious conduct, as detailed above.

312.    The circumstances render Defendant's retention of those benefits inequitable unless she pays Plaintiffs the value of the benefit.

313.    There is no legal just cause that would justify Defendant's enrichment or Plaintiffs' corresponding loss.

314.    Plaintiffs are entitled to $543,315 in damages stemming from Defendant's' unjust enrichment.

**WHEREFORE** Plaintiff Bahia Beach Holding Company LLC respectfully requests the Court find Defendant Saira Ghaffar liable to it for unjust enrichment and enter judgment in its favor for $543,315 along with attorneys' fees and costs.

**COUNT XIX**
**Unjust Enrichment**
**Plaintiff Bahia Beach Holding Company LLC**
**In the alternative: Against Defendant Nerissa Aponte**

315.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

316.    "The Puerto Rico Supreme Court recognized a cause of action under the unjust or undue enrichment doctrine in Ortiz-Andújar v. Commonwealth of Puerto Rico, 22 P.R. Offic. Trans. 774, 122 D.P.R. 817 (P.R. 1988)." Gov't of Puerto Rico v. Carpenter Co., 442 F. Supp. 3d 464, 476 (D.P.R. 2020).

317.    The aforesaid doctrine may be invoked "when the laws have not foreseen a situation where a patrimonial shift occurs [and] which shift cannot be rationally explained by the prevalent body of laws." Id at 466; citing Ortiz-Andújar, *supra*.

318.    "To prove a claim for unjust enrichment under Puerto Rico law, '[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause.'" Rivera v. Marriott Int'l, Inc., 456 F. Supp. 3d 330, 339 (D.P.R. 2020); citing Montalvo v. LT's Benjamin Records, Inc., 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (citing Hatton v. Municipality of Ponce, 1994 P.R.-Eng. 909605, 134 D.P.R. 1001, 1994 WL 909605 (1994)); see P.R. LAWS ANN. tit. 31, § 2992.

319.    Fahad caused Defendant Aponte's lavish wedding to be charged to the St. Regis' owners' expense account, despite him not being an owner. Fahad also caused the Paulson Entities to reimburse Nerissa's personal American Express credit card.

320.    Plaintiffs experienced a corresponding loss of the money it paid for the wedding and personal expenses of Defendant Aponte.

321.    The circumstances render Defendant Aponte's retention of those benefits inequitable unless she pays Plaintiffs the value of the benefit.

322.    There is no legal just cause that would justify Defendant Aponte's enrichment or Plaintiffs' corresponding loss.

323.    Plaintiffs are entitled to damages reasonably estimated to be $375,000 as a result of Defendants' unjust enrichment.

**WHEREFORE** Plaintiff Bahia Beach Holding Company LLC respectfully requests the Court find Defendant Nerissa Aponte liable to it for unjust enrichment and enter judgment in its favor for $375000 along with attorneys' fees and costs.

### COUNT XX
### Unjust Enrichment
### Plaintiff Bahia Beach Holding Company LLC
### Against Defendant Glen Acevedo

324.    The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

325.    "The Puerto Rico Supreme Court recognized a cause of action under the unjust or undue enrichment doctrine in Ortiz-Andújar v. Commonwealth of Puerto Rico, 22 P.R. Offic. Trans. 774, 122 D.P.R. 817 (P.R. 1988)." Gov't of Puerto Rico v. Carpenter Co., 442 F. Supp. 3d 464, 476 (D.P.R. 2020).

326.    The aforesaid doctrine may be invoked "when the laws have not foreseen a situation where a patrimonial shift occurs [and] which shift cannot be rationally explained by the prevalent body of laws." Id at 466; citing Ortiz-Andújar, supra.

327.    "To prove a claim for unjust enrichment under Puerto Rico law, '[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding

application of enrichment without cause.'" <u>Rivera v. Marriott Int'l, Inc.</u>, 456 F. Supp. 3d 330, 339 (D.P.R. 2020); citing <u>Montalvo v. LT's Benjamin Records, Inc.</u>, 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (citing <u>Hatton v. Municipality of Ponce</u>, 1994 P.R.-Eng. 909605, 134 D.P.R. 1001, 1994 WL 909605 (1994)); <u>see</u> P.R. LAWS ANN. tit. 31, § 2992.

328.   Fahad caused Plaintiff to pay for a vehicle and its insurance for Defendant Glen Acevedo.

329.   Plaintiffs experienced a corresponding loss of the money it paid for Defendant Glen Acevedo's use of its vehicle.

330.   The circumstances render Defendant Acevedo's retention of those benefits inequitable unless he pays Plaintiffs the value of the benefit.

331.   There is no legal just cause that would justify Defendant Acevedo's enrichment or Plaintiffs' corresponding loss.

332.   Plaintiffs are entitled to damages reasonably estimated to be $35,000 as a result of Defendants' unjust enrichment.

**WHEREFORE** Plaintiff Bahia Beach Holding Company LLC respectfully requests the Court find Defendant Glen Acevedo liable to it for unjust enrichment and enter judgment in its favor for $35,000 along with attorneys' fees and costs.

**COUNT XXI**
**Unjust Enrichment**
**Plaintiff Paulson PRV Holdings LLC**
**Against Defendants Farah Vayani and Syber Group**

333.   The allegations in paragraphs 1 to 163 are hereby re-alleged as if fully incorporated herein.

334.   "The Puerto Rico Supreme Court recognized a cause of action under the unjust or undue enrichment doctrine in <u>Ortiz-Andújar v. Commonwealth of Puerto Rico</u>, 22 P.R. Offic.

Trans. 774, 122 D.P.R. 817 (P.R. 1988)." <u>Gov't of Puerto Rico v. Carpenter Co.</u>, 442 F. Supp. 3d 464, 476 (D.P.R. 2020).

335.    The aforesaid doctrine may be invoked "when the laws have not foreseen a situation where a patrimonial shift occurs [and] which shift cannot be rationally explained by the prevalent body of laws." <u>Id</u> at 466; citing <u>Ortiz-Andújar</u>, *supra*.

336.    "To prove a claim for unjust enrichment under Puerto Rico law, '[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause.'" <u>Rivera v. Marriott Int'l, Inc.</u>, 456 F. Supp. 3d 330, 339 (D.P.R. 2020); citing <u>Montalvo v. LT's Benjamin Records, Inc.</u>, 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (citing <u>Hatton v. Municipality of Ponce</u>, 1994 P.R.-Eng. 909605, 134 D.P.R. 1001, 1994 WL 909605 (1994)); <u>see</u> P.R. LAWS ANN. tit. 31, § 2992.

337.    Fahad's sister, Farah, not to be outdone by her siblings, sold IT devices and services to Plaintiff Paulson PRV Holdings IT at inflated prices to pocket the increased commissions.

338.    Without disclosing the obvious conflict of interest, Ghaffar engaged his sister's company and caused payments in excess of $100,000 to be issued in the name of Defendant Syber in 2023.

339.    Plaintiffs experienced a corresponding loss of the money it paid for these devices and services.

340.    The circumstances render the defendants' retention of those benefits inequitable unless they pay Plaintiff the value of the benefit.

341.    There is no legal just cause that would justify Defendants' enrichment or Plaintiffs' corresponding loss.

342.    Plaintiffs are entitled to damages reasonably estimated to be $100,000 as a result of Defendants' unjust enrichment.

**WHEREFORE** Plaintiff Paulson PRV Holdings LLC respectfully requests the Court find Defendants Farah Vayani and Syber Group LLC jointly and severally liable to it for unjust enrichment and enter judgment in its favor for $100,000 along with attorneys' fees and costs.

**WE HEREBY CERTIFY** that on this date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

**RESPECTFULLY SUBMITTED** San Juan, Puerto Rico, on October 16, 2023.

**DMR Law LLC**
**Counsel for Plaintiffs**
Capital Center Bldg.
Suite 1101
San Juan, PR 00918
Tel. 787-331-9970

*s/ Maria A. Dominguez*
Maria A. Dominguez
USDC-PR No. 210908
maria.dominguez@dmralaw.com

*s/Javier F. Micheo Marcial*
Javier F. Micheo Marcial
USDC-PR No. 305310
j.micheo@dmrpr.com

*s/ Julián R. Rodríguez-Muñoz*
Julián R. Rodríguez-Muñoz
USDC-PR No. 308301
j.rodriguez@dmrpr.com

**OVED & OVED LLP**
401 Greenwich Street
New York, New York 10013
Tel: 212.226.2700

Terrence A. Oved
*(pro hac vice forthcoming)*
terry@oved.com

*Counsel for Plaintiffs*



WWW.CSTLAWPR.COM
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434
Fax: (787) 523-3433
jcasillas@cstlawpr.com
lllach@cstlawpr.com

*S/JUAN J. CASILLAS-AYALA*
**JUAN J. CASILLAS-AYALA**
USDC PR NO. 218312

*S/LUIS F. LLACH-ZÚÑIGA*
**LUIS F. LLACH ZÚÑIGA**
USDC PR NO. 223112

Darren Oved
*(pro hac vice forthcoming)*
*darren@oved.com*

Andrew J. Urgenson
*(pro hac vice forthcoming)*
*andrew@oved.com*

Glen Lenihan
*(pro hac vice forthcoming)*
*glenihan@oved.com*